**UNITED STATES, Appellee,**

v.

**Lorin T. JESSEN, Specialist Four, U.S. Army, Appellant.**

No. 39,220.
SPCM 13873.

U. S. Court of Military Appeals.

Dec. 14, 1981.

For Appellant: *Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John F. Lymburner, Major Carlos A. Vallecillo, Captain Courtney B. Wheeler* (on petition).

For Appellee: *Major Ted B. Borek, Major Robert B. Williams, Captain Lawrence W. Fitting* (on petition).

Opinion

EVERETT, Chief Judge:

On November 30, 1978, and January 25, 1979, at Wurzburg, Federal Republic of Germany, appellant was tried by a special court-martial composed of officers for possessing, transferring, and selling 3.78 grams of marihuana in the hashish form on August 26, 1978.[1] After appellant was found

1. The three drug offenses were charged as violations of Article 934, Uniform Code of Military Justice, 10 U.S.C. § 134.

guilty as charged, the military judge observed that the offenses were "clearly multiplicious" and that he intended to dismiss two of the three specifications. When trial counsel elected to retain the sale offense, the judge dismissed the other charges. The court members then sentenced the appellant to a bad-conduct discharge and reduction to the grade of Private E–1. Jessen's conviction was upheld during the course of all intermediate reviews. We granted review (9 M.J. 277) of these two issues:

## I

THE MILITARY JUDGE ERRED TO APPELLANT'S SUBSTANTIAL PREJUDICE WHEN HE ADMITTED INTO EVIDENCE PROSECUTION EXHIBIT 2, A PROPERTY RECEIPT FORM, A DOCUMENT WHICH WAS PREPARED PRIMARILY FOR THE PURPOSES OF PROSECUTION.

## II

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY EQUATING SUBSTANTIAL DOUBT AND REASONABLE DOUBT IN HIS INSTRUCTIONS TO THE JURY.

## I

Military Police Investigator Stender testified that he had "been a covert drug agent" since February 1978, and had been involved in 25 to 30 cases. On the night of August 26, 1978, when he was working undercover at the Rock Action Disco and was asking "is there any smoke around," he ran into Ronny Steves, who told him "that when Jessen got back he'd have some." Later that night Steves approached Stender and said, "There's Jessen, let's go talk to him." According to Stender, after they had spoken to Jessen he "said that he had one piece that he'd sell me." Thereafter Stender, Jessen, Steves, and two unidentified German nationals drove to the woods in a Volkswagen because, as Stender explained, appellant "wanted . . . [him] to smoke some

of it so I could see how good it was." Stender further testified that when they got "to the woods, . . . Jessen pulled the chunk out of his pocket and he made a bowl and he passed that around." However, according to Stender, "I simulated smoking it with these people"—a procedure he described as:

That's when you take the smoke into your mouth or the smoke and then you blow it back out. Then you do all the normal things that people do when they smoke hash. You cough, choke and gag, blow a lot of smoke around. On this particular occasion it was fairly easy because there were five people in a VW Bug. By the time it got around to me there was so much smoke in the car all I had to do was blow some around.

After the group had smoked the substance for a half hour or so, they returned to the club. As they got out of the car, Stender testified that he paid the appellant $20.00 for a piece of hash.

Stender was cross-examined at some length about the circumstances of the encounter—apparently in order to create a doubt as to the reliability of his identification of appellant. However, none of the questioning appears to have been directed to disproving that the parties had been smoking hashish. Then, at the conclusion of Stender's testimony, the Government, with the defense declining to object, offered into evidence prosecution exhibit 1, a laboratory report, and prosecution exhibit 2, a chain-of-custody document.

The defense presented extensive evidence to establish that appellant was of good character, would have had no occasion to possess or sell drugs, and could not have been the person with whom Stender conducted his transaction. In this connection, the defense also relied on Stender's admission that when he encountered Jessen a few days after the events which gave rise to the charges, appellant did not seem to remember him or the earlier events. However, at no point during the extensive argument on findings was any question raised as to the identity of the substance which had been purchased by Stender.

## II

In ruling in *United States v. Nault*, 4 M.J. 318, 320 (C.M.A.1978), that a chain of custody was incomplete, the majority opinion stated in footnote 7 (apparently by way of dictum) that:

It is true that this Court is on record in *United States v. Burge*, 1 M.J. 408 (C.M.A.1976) upholding the admissibility of a police blotter containing entries establishing a chain of personal custody. We are unable, however, to analogize that rationale to the instant case.

The proposition that a report showing the chain of custody of an alleged drug qualifies for the business records exception in a prosecution for possession of a substance in violation of a regulation simply flies in the face of paragraph 144*d* of the Manual for Courts-Martial, United States, 1969 (Revised edition). That evidentiary proscription excludes records made "principally with a view to prosecution." Our Brother correctly points out administrative reasons for allowing inventory of personal property of persons taken into custody. He goes on to reason, for example, that, as we have indicated, corrected morning reports serve valid administrative purposes; they do not therefore, as a matter of law, constitute records made with a view toward prosecution. The same result, he argues, should follow for chain of custody records. However, we are unwilling to so dissipate the plain meaning of the "view to prosecution" proscription in paragraph 144*d* as applied to the facts of this case.

Subsequently, in *United States v. Porter*, 7 M.J. 32 (C.M.A.1979), and *United States v. Neutze*, 7 M.J. 30 (C.M.A.1979), the Court held that chain-of-custody receipts prepared on DA Form 4137 were inadmissible since they were prepared "principally with a view to prosecution." *See* para. 144*d*, Manual for Courts-Martial, United States, 1969 (Revised edition).[2]

█ In the case at bar, the Army Court of Military Review declined to apply these precedents in considering the admissibility of prosecution exhibit 2, the chain-of-custody document. In so doing, the court below relied on *United States v. Parker*, 8 M.J. 584 (A.C.M.R.1979), which had reasoned that *Porter* and *Neutze* were only prospective in effect. Appellate government counsel take the same position on this appeal.

Several months after *Porter* and *Neutze* were decided, this Court summarily disposed of four cases by orders which, on the authority of *United States v. Nault, supra*, reversed the convictions. *United States v. McKinney*, 7 M.J. 477 (C.M.A.1979); *United States v. Bagby*, 7 M.J. 476 (C.M.A.1979); *United States v. Tresvant*, 7 M.J. 476 (C.M.A.1979), *reconsidered*, 10 M.J. 18 (C.M.A.1980), and *United States v. Guinn*, 7 M.J. 475 (C.M.A.1979), *reconsidered*, 10 M.J. 18 (C.M.A.1980). In each case the trial had occurred prior to the decision in *Nault*, and chain-of-custody receipts had been admitted into evidence. Appellate defense counsel now suggest that it would be anomalous to hold that chain-of-custody receipts were inadmissible in cases tried before *Nault* was decided, but were properly received in evidence in cases tried after *Nault* but prior to *Porter* and *Neutze*. This logic is convincing. However, while the Court cited only the *Nault* decision as its authority in each of the four cases, the orders made no specific reference to footnote 7 of *Nault*, which concerns chain-of-custody receipts. Accordingly, since there is some uncertainty as to the intent of the four summary dispositions which relied solely on *Nault*, we are not precluded from now examining in detail the retroactivity of the principle that was finally announced in *Porter* and *Neutze*.

In *United States v. Stuckey*, 10 M.J. 347, 348 (C.M.A.1981), we referred to "[t]he relevant criteria for prospective application" set forth in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)—namely, "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the

---

**2.** The Military Rules of Evidence, which became effective on September 1, 1980, now allow the receipt in evidence of "chain of custody documents." Mil.R.Evid. 803(6), (8).

administration of justice of retroactive application of the new standards." *See Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969). Undoubtedly the first criterion is the most critical.

Unlike the rulings in *Stuckey* and *United States v. Kalscheuer*, 11 M.J. 373 (C.M.A. 1981), which involved search and seizure and protection of privacy against intrusion by law enforcement agents, the holdings in *Porter* and *Neutze* as to the admissibility of chain-of-custody documents concern evidential reliability. The rationale of the *Nault* footnote, the decisions in *Porter* and *Neutze*, and the language in paragraph 144 *d* of the Manual on which they purport to rest is that, unlike some business entries and official records, chain-of-custody documents should not be received in evidence, since they are prepared principally for prosecutorial purposes and therefore are less trustworthy. Indeed, the exclusion of such evidence reflects some of the same underlying concerns which have given rise to the hearsay prohibition and recognition of a defendant's right of confrontation.

However, even though the restrictions on admissibility of chain-of-custody documents are designed to enhance the reliability of the evidence on which court-martial findings are based, these restrictions do not constitute a safeguard which—like the right of counsel—is so basic that retroactive application must take place. Indeed, if the protection involved were that basic, the President would not be free now to eliminate that protection by promulgating Mil.R. Evid. 803(6) and (8) which overturn *Porter* and *Neutze.*

Turning to the second criterion for prospective application—reliance on the old standard or practice—we perceive scant justification for prosecutors to have relied on chain-of-custody receipts after *Nault's* publication. Even though located in a footnote,

*Nault's* repudiation of the admissibility of chain-of-custody documents was apparent; also the dissent in *Nault* served to call attention to the full import of the majority opinion.

In connection with the third criterion for retroactivity—the effect on the administration of justice—we realize that over the years chain-of-custody receipts have been received in evidence in many trials by courts-martial. Thus, a fully retroactive application of the *Porter* and *Neutze* decisions, whereunder convictions by court-martial could even be attacked collaterally if chain-of-custody documents had been received in evidence at the trial, would have extensive impact on the administration of military justice. Of course, a partly prospective application, which affected only cases pending direct review when *Nault* was decided—or when *Porter* and *Neutze* were decided—would have much less extensive effects.

Having considered all three criteria for prospective application—and especially the purpose of *Porter* and *Neutze* to enhance fact-finding reliability—we conclude that, subject to a limitation stated hereinafter, the principle stated in footnote 7 of *Nault* should be applied to any case in which direct review had not been completed when the *Nault* opinion was handed down.[3]

The limitation we impose concerns the failure of defense counsel to object at trial to admission of the chain-of-custody receipt. In *Neutze*, such a failure was declared to be "of no moment," since paragraph 139*a* of the Manual then provided that "[h]earsay . . . does not become competent evidence by reason of a mere failure to object to its reception in evidence." 7 M.J. 31.[4] However, in determining the extent to which a new rule should be retroactively applied, we consider it appropriate to inquire whether

---

3. Of course, the chain-of-custody receipt may be admissible for purposes other than the truth of the entries contained therein. For example, in *United States v. Madela*, 12 M.J. 118 (C.M.A.1981), the markings and numbers referred to in the chain-of-custody receipt linked evidence seized to the lab report.

4. The Military Rules of Evidence also have changed this principle. Mil.R.Evid. 103(a)(1) and 802.

an accused and his counsel evidenced dissatisfaction with the earlier procedure or with the results that it produced at trial. Thus, in dealing with an accused's constitutional right to have his guilt established beyond reasonable doubt, *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), we were unwilling, absent a defense objection at trial, to grant relief to an accused who on appeal correctly complained of the misleading effect of the standard instruction on reasonable doubt which the military judge had given. *United States v. Salley*, 9 M.J. 189 (C.M.A.1980). Likewise, in our review of convictions adjudged prior to *Porter* and *Neutze*, we shall not reverse because a chain-of-custody document was admitted in evidence at the trial, unless the defense counsel objected to the introduction of that document or in some other manner contested the reliability of the information it contained.[5] We consider this approach to accord with our emphasis on the first criterion for prospective application—namely, the purpose to be served by rejecting the former procedure.

This prospective application is especially appropriate in those cases arising after the *Nault* opinion and before *Porter* and *Neutze*. At that time not only prosecutors but also defense counsel were aware of the Court's stated position concerning chain-of-custody receipts. However, they had not been advised by *Neutze* that objection was unnecessary. Thus, a failure to object to a receipt or in some other way to contest its admissibility can be viewed as the waiver of a known right. Under such circumstances there is little reason now to provide to an appellant the windfall of a holding that a chain-of-custody receipt to which he did not object was inadmissible. Accordingly, since in the case at hand, defense counsel neither objected to the chain-of-custody receipt nor contested in any way the reliability of its information, we decline here to apply the *Porter* and *Neutze* decisions retroactively.

### III

Stender's testimony amply established his familiarity with hashish. His "simulated smoking" with appellant and the four other men provided him ample opportunity to determine the identity of the substance which was in his mouth, nose, and lungs. As was observed in *United States v. Clark*, 613 F.2d 391, 405–06 (2d Cir. 1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980):

> Evidence of a chemical analysis of the substance is not essential to a valid conviction for a narcotic offense. Neither is it necessary that direct evidence be presented to prove the nature of the substance. *United States v. Quesada*, 512 F.2d 1043, 1045 (5th Cir. 1975), *cert. denied*, 423 U.S. 946, 96 S.Ct. 356, 46 L.Ed.2d 277 (1975). (Citation omitted.)
>
> > Just as with any other component of the crime, the existence of and dealing with narcotics may be proved by circumstantial evidence; there need be no sample placed before the jury, nor need there be testimony by qualified chemists as long as the evidence furnished ground for inferring that the material in question was narcotics.
>
> *United States v. Agueci*, 310 F.2d 817, 828 (2d Cir. 1962) *cert. denied* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

*See United States v. Courts*, 9 M.J. 285 (C.M.A.1980).

Stender had been invited to smoke in order to sell him hashish; in effect, he was testing the product offered him. If, as he testified, the substance he simulated smoking was hashish, then the item which he purchased was also hashish. The only significance of the chain-of-custody document was to provide a basis for introduction of the lab report. However, the lab report was irrelevant to the resolution of the issue on which the trial turned—namely, the identity of the person who made the sale to Stender. The accuracy of the lab report in its representation that the substance tested

---

5. The contest might be evidenced by requests for production as witnesses of the persons who, according to the receipt, had handled the evidence, or it might be by offering evidence that contradicted the chain-of-custody document.

was 3.78 grams of marihuana could not persuade the court members to find that it was appellant instead of some other person who sold it to Stender. Indeed, the only effect of the lab report on the findings was to enable the court members to be more specific in their findings and so to find that the appellant had sold, transferred, and possessed "3.78 grams" of marihuana, rather than "some amount." The greater specificity of the findings which resulted from admission of the lab report in evidence did not authorize a more severe punishment under the Table of Maximum Punishments, nor would it have tended to increase the sentence in some other way. In short, even if the military judge had erred in admitting the two prosecution exhibits, that error would not have prejudiced appellant in the case at bar. *Cf. United States v. White*, 9 M.J. 168 (C.M.A.1980).

IV

█ As to the appellant's second claim of error, we observe that our decision in *United States v. Salley, supra*, is dispositive, for the defense counsel neither objected to any of the instructions on reasonable doubt nor proposed any clarifying instructions.

V

The decision of the United States Army Court of Military Review is affirmed.

COOK, Judge (concurring in the result):

For the reasons set out in my separate opinion in *United States v. Nault*, 4 M.J. 318, 320 (C.M.A.1978), I concur in the determination that the chain-of-custody exhibit was properly before the court-martial. I, therefore, join in affirmance of the decision of the United States Army Court of Military Review.

FLETCHER, Judge (dissenting):

I agree with the majority that footnote 7 in *United States v. Nault*, 4 M.J. 318 (C.M.A.1978), was gratuitous regarding the actual decision in that case. However, in view of Part II of the principal opinion in the present case, I also believe that its holding today concerning the retroactivity of this Court's decision in *United States v. Porter*, 7 M.J. 32 (C.M.A.1979), and *United States v. Neutze*, 7 M.J. 30 (C.M.A.1979), is likewise gratuitous.

Turning to the summary dispositions in the cases of *United States v. McKinney*, 7 M.J. 477 (C.M.A.1979); *United States v. Tresvant*, 7 M.J. 476, *reconsidered*, 10 M.J. 18 (C.M.A.1980); *United States v. Bagby*, 7 M.J. 476 (C.M.A.1979), and *United States v. Guinn*, 7 M.J. 475 (C.M.A.1979), *reconsidered*, 10 M.J. 18 (C.M.A.1980), I find the majority's belated speculation as to the plain meaning of these orders is mere circuity. In any event, it is clear that the dictum in *United States v. Nault, supra*, was adopted in *United States v. Porter, supra*, and *United States v. Neutze, supra*, as the law of this Court. Moreover, it was applied to cases tried before *United States v. Nault, supra*, as evidenced by the summary dispositions listed above. This law should also, as a matter of fairness and consistency, be applied to the present case tried after *Nault*, but before *Porter* and *Neutze*. In both situations, the accused are similarly situated in that their courts-martial were completed but not final within the meaning of Article 76, Uniform Code of Military Justice, 10 U.S.C. § 876, at the time *Porter* and *Neutze* were decided. I need not offer any further gratuitous statements as to the applicability of *Porter* and *Neutze* to other cases final before that time.

My next point of disagreement with the majority concerns its *post facto* adoption of an objection or waiver requirement which I perceive to be contrary to paragraph 139*a*, Manual for Courts-Martial, United States, 1969 (Revised edition), and this Court's decision in *United States v. Neutze, supra* at 31. First, I note that this case was tried before our decision in *Neutze*, so any advice given or not given in that decision on this question would have no impact on this appellant's decision to voluntarily waive a known right at his court-martial. Second, *Neutze* itself did not carve out by silence any affirmative requirement for objection to the

hearsay contained in chain-of-custody documents, but rather simply reaffirmed the state of the law at that time that a failure to object to hearsay evidence does not constitute a waiver of the evidence's inadmissibility. Para. 139a, Manual, *supra.* Finally, unlike his express action in the area of hearsay evidence, the President had not promulgated any rule concerning the failure to object to a military judge's instruction on reasonable doubt. For that reason, I find the rationale of this Court in *United States v. Salley,* 9 M.J. 189 (C.M.A.1980), also inapplicable to the present situation.

Finally, I disagree that this case is properly within the purview of *United States v. White,* 9 M.J. 168 (C.M.A.1980). There, this Court was concerned with independent evidence in the record of trial that corroborated the accused's confession to possession of marihuana and his admission as to the chemical nature of the charged substance. Such a situation does not exist in this case.

I dissent.