**UNITED STATES**

v.

**Technical Sergeant Michael F. DENNIS, FR 544–46–8635 United States Air Force.**

**ACM 23723.**

U.S. Air Force Court of Military Review.

Argued 20 June 1983.

Decided 1 Sept. 1983.

Appellate Counsel for the Accused: Colonel George R. Stevens and Captain Kathleen G. O'Reilly.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Captain Richard O. Ely, II.

Before KASTL, RAICHLE, and SNYDER, Appellate Military Judges.

## DECISION

SNYDER, Judge:

After a vigorously contested trial, the accused was convicted by general court-martial of nine specifications of possession, use, and transfer of marihuana. His sentence extends to a dishonorable discharge, confinement at hard labor for two years, and reduction to airman basic. He has submitted six assignments of error for this Court's consideration. Finding no error prejudicial to the substantive rights of the accused, we affirm with modification of the sentence.

## I. LEGALITY OF SEARCH

The first issue we will discuss is the accused's claim that the military judge erred in denying his motion to suppress prosecution exhibits 4 and 5, a tobacco tin which contained marihuana in the hashish form and paraphernalia, and seven 10 pound sterling notes.

The search of the accused's off-base quarters was executed jointly by special agents of the Air Force Office of Special Investigations (AFOSI) and British police. Both the AFOSI and British police obtained search authorizations from their respective authorizing officials. However, the information used by the British police to apply for their warrant was provided by AFOSI. Consequently, the requirements of the

Fourth Amendment of the Constitution are applicable. *United States v. Jones,* 6 M.J. 226 (C.M.A.1979).

In an affidavit [1] to the base commander, Special Agent C avowed that Airman R, a source of known reliability, had received a quantity of marihuana in the hashish form from the accused earlier in the day in question. Special Agent C related that he had field tested the marihuana, and that the accused had been told by R, as instructed, that he would pay the accused that evening at the accused's quarters. The commander was also informed that R had observed the accused smoke marihuana on two prior occasions, and that on one of those occasions the accused had transferred a small quantity of marihuana to R. That quantity of marihuana was also surrendered to Special Agent C who field tested the marihuana. Both field tests were positive for the presence of marihuana.

Special Agent C orally informed the base commander that R had provided information on at least two British nationals which had resulted in their arrest by British authorities, and that previous information provided by R had been corroborated by another source. The affidavit stated that R would be thoroughly searched and provided with both an electronic signaling device and British currency with the serial numbers pre-recorded. Upon either observing drugs *or* paying the accused the money, R was to activate the signaling device and also initiate a visual signal using the light in the accused's bathroom. After receiving either or both of those signals, the search of the accused's quarters would occur.

After both prearranged signals were given, the accused's quarters were entered and searched. British Detective Constable H (hereafter Detective) was the first investigator to enter the accused's quarters. He observed the accused sitting by a table and a tobacco tin on the table. He seized the tin and observed what appeared to be hashish therein. Shortly thereafter, Special Agent C entered and confronted the accused, observing him to be in the same position as observed by Detective H. Special Agent C observed a wallet on the table in front of the accused with parts of British currency protruding therefrom. While the money was being removed from the wallet, the accused spontaneously stated, "What are you doing, that's my money." Special Agent C saw and recognized one note of currency from which he had previously memorized the serial number prior to giving it to R.

■ Probable cause exists when there is a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched. Mil. R.Evid. 315(f)(2). The military judge found that even if the information about drugs was too stale, probable cause existed to search the residence for the money as evidence of crime. We too find that there was sufficient information from which the base commander could conclude that the informant was reliable and his information credible. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

■ The accused, however, attacks the search on three additional grounds. He contends that conditioning the search on observing the prearranged signals constituted an impermissible delegation of the authority to authorize a search. With this proposition we cannot agree.

In *United States v. Ness,* 13 U.S.C.M.A. 18, 32 C.M.R. 18 (1962), an informant of known reliability informed a special agent that two caucasian males talked to a Korean national who was a known black marketeer and receiver of stolen Government property. The informant heard the parties discuss the sale of aircraft amplifiers. The Korean was to be picked up by the two caucasians later that evening at an oil station on a named road. The informant advised that one of the caucasians was a champion bowler at the air base, and provided the license plate number of the bowler's automobile. The agent reviewed the

---

1. The military judge found part of the affidavit to be "idle gossip at best," and accorded it no weight in arriving at his finding. Thus, that part of the affidavit is not discussed.

applicable records and ascertained that the automobile was registered to the accused, and that the accused worked at a bowling alley on the base. He decided to search the vehicle if the events, as related by the informant, transpired.

A search authorization was obtained. The anticipated events came to pass, and Ness was apprehended and his automobile impounded. A search disclosed the stolen amplifiers. At trial, the agent testified that if the Korean had not entered the vehicle, he "would have called the whole thing off."

The Court held that conditioning a search authorization on the verification of a significant fact did not vitiate the authorization. *United States v. Ness, supra.*

It is noteworthy that the authorization in *Ness* was absolute; the Court inferred that the authorizing official conditioned the authorization on the verification of a significant event. In the case *sub judice,* the Government's position is even more unassailable since the base commander chose to specify the condition on which he found probable cause. Rather than being indicative of impropriety, we find that his actions reflect due consideration of the information submitted to him. *United States v. Ness, supra.*

■ Alternatively, the accused contends that seizure of the tobacco tin was improper because it was beyond the scope of the search. The testimony at trial was disputed as to whether the tin's top was slightly ajar or completely closed, thereby requiring one to open it in order to see inside. That issue need not detain us. Having determined that probable cause existed to search for the "marked" currency, the tobacco tin was a reasonable place to look for currency. This is supported by the fact that Detective H noted and seized the tin prior to anyone observing the accused's wallet.

The final basis advanced to attack the search is that the affidavit contained statements that were either intentionally false or merely in reckless disregard of the truth. The affidavit stated that R had learned from another person that the accused had performed temporary duty in Morocco and obtained marihuana in the form of hashish oil while doing so. At trial, the defense presented evidence that the accused had never been ordered to perform temporary duty in Morocco. It was also established that Special Agent C never reviewed the accused's pay records reflecting the absence of temporary duty in Morocco.

We find that the facts fail to support this contention. The accused judicially admitted that he had taken leave in Morocco, although he fervently denied that he purchased drugs during the trip. The fact the informant mislabeled the accused's trip to Morocco as a "TDY" rather than leave does not alter the fact that the accused did, in fact, go to Morocco. The military judge properly determined that the defense did not meet its burden of establishing a falsity or reckless disregard of the truth. Mil.R. Evid. 311(g)(2).[2] The base commander testified that he viewed probable cause as existing even without the information about the Morocco trip. Additionally, the military judge specifically excluded the paragraph of the affidavit relating to Morocco in making his determination of probable cause.

The military judge's rulings that there was probable cause to support the issuance of the search authorization, and that there was not an improper delegation of the commander's authority to authorize searches, are amply supported by the facts. Therefore, we conclude that the military judge did not err.

## II. VOLUNTARINESS OF STATEMENTS

The accused next complains that his inculpatory statements to AFOSI and British

2. At trial, the defense attempted to bolster this contention by asserting the fact that Special Agent C had wilfully misstated information in a search affidavit relating to another investigation subsequent to the search of the accused's quarters. The military judge properly ruled that there was no evidence connecting the subsequent search with the investigation of the accused, and that there was no evidence to support the claim that Special Agent C actively pursued a design of falsifying search affidavits.

authorities should have been suppressed because they were obtained in violation of the right to counsel warning of Mil.R.Evid. 305(d)(1), and, alternatively, that they were the result of coercion. Additional facts are necessary to place the issue in perspective.

■ Initially, we affirm the finding of the military judge that the accused's statement to Special Agent C as he was removing the British currency from the accused's wallet was spontaneous. It was not the product of an interrogation or act designed to elicit an incriminating statement. Therefore, the fact that it was made prior to the accused being advised of his rights did not render the statement inadmissible. *United States v. Workman,* 15 U.S.C.M.A. 238, 35 C.M.R. 200 (1965); *United States v. Lovell,* 8 M.J. 613 (A.F.C.M.R.), *pet. denied,* 9 M.J. 17 (C.M.A.1979).

■ As mentioned, the accused's quarters were searched by AFOSI and British officials. The British officials were present, in part, as a result of the applicable Status of Forces Agreement (SOFA). Additionally, Detective H testified that, although they did not previously have sufficient information to question or search the accused, their parallel but independent investigation led them to suspect the accused of drug involvement. Detective H candidly testified that the search warrant obtained by him was based on the same information used by Special Agent C to obtain the search authorization from the base commander. However, upon arriving in front of the accused's quarters, an event transpired which changed the course of Detective H's involvement.

While positioning all of the investigators around the accused's quarters, Special Agent C and Detective H observed a male individual depart the accused's residence. The individual was the accused's brother-in-law, and a British national, named O. Detective H placed O under arrest and seized hashish from O's person prior to his entering the accused's residence. Although the accused was initially apprehended by Special Agent C, Detective H arrested and assumed custody of the accused and transported him to the local British police station.

At the station, the accused was briefly questioned by Detective H, and, in response to the accused's request, Special Agents C and BH entered the interview room. They duly advised the accused of his rights in accordance with Article 31, U.C.M.J., 10 U.S.C. § 831, and *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). After waiving his rights and a brief exchange, the accused was asked about the hashish found in his residence. The accused requested counsel. Special Agent C informed the accused that he would have to terminate the interview. He also informed the accused that the British rules were different; that British investigators did not have to follow the American rules relating to the right to consult with counsel during an interrogation.

Detective H resumed his interrogation, and, after three hours, the accused made an inculpatory statement admitting to the possession, use, and transfer of marihuana. Special Agent C remained at the station house the entire time after his interview of the accused, but he did not enter the interview room until the accused's oral statement was being reduced to writing.

The accused was subsequently released to Special Agent C's custody and transported to the base, where he was surrendered to the Security Police.

We hold that British Detective H's interrogation was a foreign interrogation which was neither conducted, instigated by, or participated in by Special Agent C or other United States military personnel. Detective H was acting independent of the AFOSI rather than as an agent for AFOSI.

Detective H's testimony can reasonably be construed to reflect an attitude that he was merely "along for the ride," in fulfillment of the SOFA requirements, at the start of the evening in question. However, the record of trial amply supports the conclusion that the entire nature of his participation changed with the arrest of the accused's brother-in-law, O, and the discovery

of hashish in the accused's residence. His testimony impresses us as straightforward and candid on the salient points. The following portions are illuminating:

Q. (By IDC) Can you recall if there was any discussion at first of taking Sergeant Dennis to the base, to the OSI office?

A. No, there was no question but that he would go straight to the police station.

\* \* \* \* \* \*

Q. (By TC) Okay, Mr. Henry, why did you want to interview Sergeant Dennis that evening?

A. Well, basically because, you know, the offense happened in my area, it's a British offense, you know, it was my duty to interview him about it.

\* \* \* \* \* \*

Q. Would it be fair to say that he [accused] was, before 13 January 1982, under investigation by your department?

A. I think it would be better to say that he came up in the inquiries that were being made, we didn't have any sort of evidence that would connect him with anyone, we didn't have enough to go around and interview him, I think that would be a fairer thing to say.

\* \* \* \* \* \*

Q. The information that you had, Mr. Henry, before the 13th of January 1982, was any of that information concerning Sergeant Dennis, of course, supplied by the Air Force, the OSI or any branch of the American government?

A. No, I can honestly say I don't recall that his name came up through any one of the American services.

Q. Was there any agreement between you or your office, and the OSI to the effect that if he didn't talk to the OSI they would turn him over to you?

A. No, sir. I think I should say that as far as the OSI were concerned, their interview with him *was irrelevant as far as I'm concerned, I was particularly interested in the offense that had been committed in Norfolk.* (emphasis added)

The military judge's findings that Detective H had jurisdiction over the alleged offense, that he was not questioning the accused at the request of U.S. agents, and that he had a valid and independent reason to do so, is amply supported by the evidence of record. We are convinced as a matter of fact that Detective H was acting independently of the AFOSI.

The fact that Special Agents C and BH remained at the station to see if Detective H's interrogation would bear fruit is of no benefit to the accused. Mere presence at an interrogation, let alone mere presence at the *situs,* does not, in and of itself, render the AFOSI personnel participants. *United States v. Jones, supra;* Mil.R.Evid. 305(h)(2). This fact is not altered by an earlier joint search. Accordingly, we find that Special Agents C and BH did not participate in any fashion in Detective H's interrogation of the accused.

## ALLEGED COERCIVE INTERROGATION

The accused's alternate attack on his inculpatory statement to Detective H is that it was obtained as a result of coercion—specifically, the length of the interview combined with the accused's sinus attack and headache, Detective H threatening the accused with confinement up to seven days, and threatening to question the accused's wife if he did not make a statement. The accused claimed at trial that the above threats led him to make a false incriminating statement in order to obtain his freedom.

■ Although conducted without American participation, a statement obtained during a foreign interrogation is, nevertheless, involuntary and inadmissible, if obtained by the use of coercion, unlawful influence, or unlawful inducement. Mil.R.Evid. 305(h)(2).

■ There is no dispute that Detective H gave the accused the standard British caution at the time of his arrest, which was the accused's right not to say anything. Detective H testified that he reminded the accused that "he was under caution" prior to

beginning his interrogation. He also related that the accused requested counsel and that he told the accused that the British rules were different from American ones. In short, he would not be allowed to consult with counsel. There is also no dispute over the fact that Detective H could, under British law, properly refuse the accused access to legal counsel.

After the military judge ruled the accused's statements were voluntary and admissible, the issue was properly submitted to the members under proper instructions. *Cf. United States v. Jourdan,* 1 M.J. 482 (A.F.C.M.R.), *aff'd,* 50 C.M.R. 917 (C.M.A. 1975).

Other than the claimed threats, the accused's assertion reduces itself to one of an overly long interview depriving him of his free will. Applying Article 31(d), *United States v. Jourdan, supra,* we hold that there was no coercion, unlawful influence or inducement. We find that the accused made a voluntary and conscious decision to make a statement.

An interrogation is not inherently coercive. *See United States v. Moore,* 4 U.S.C. M.A. 482, 16 C.M.R. 56 (1954). It is the manner in which an interrogation is conducted which may render it a coercive act. *United States v. Houston,* 15 U.S.C.M.A. 239, 35 C.M.R. 211 (1965). Detective H testified that a three hour interrogation was not an inordinately lengthy interrogation by British standards. A significant point, however, is Detective H's testimony that most of the interrogation consisted of attempting to obtain information on British nationals with whom he suspected the accused of being involved. Additionally, at least some of the time was taken reducing the accused's statement to writing.

The accused was not deprived of any bodily comforts. We also find that the accused was not threatened with the prospect of his wife being interrogated. Early in Detective H's testimony, he related that in his attempt to obtain the truth he advised the accused that his brother-in-law had denied ownership of the tobacco tin and that he was satisfied that it did not belong to the accused's wife. The only other mention of the accused's wife was in response to a question by the accused; namely, Detective H advised that had she been a suspect, she would have been taken into custody.

We are also persuaded that Detective H did not threaten the accused with continued confinement if he did not make a statement. Our reading of the entire testimony convinces us that if the subject was discussed, it was in response to an inquiry by the accused, and that Detective H's response was a general one, rather than relating specifically to the accused's case. Providing an incriminating statement in order to stop an interrogation does not, in and of itself, render a confession involuntary. *See United States v. McQuaid,* 9 U.S.C.M.A. 563, 26 C.M.R. 343 (1958).

We conclude that the accused's decision to make a statement resulted from his own mental forces. None of Detective H's actions raised hope if the accused made a statement, or raised fear if he declined to make a statement. *United States v. Carmichael,* 21 U.S.C.M.A. 530, 45 C.M.R. 304 (1972); *cf. United States v. Handsome,* 21 U.S.C.M.A. 330, 45 C.M.R. 104 (1972). Accordingly, we hold that the military judge properly admitted the accused's statement into evidence and properly instructed the members on their responsibility relating thereto. Mil.R.Evid. 304(e)(2).

### III. MOTIONS FOR MISTRIAL

#### A. Testimony Relating to Polygraph Examination.

▮ The accused also contends that the military judge erred in denying a Motion for a Mistrial after the Government's key witness, Airman R, mentioned the word "polygraph" in response to a question during redirect examination. We disagree.

The response in issue occurred during redirect examination after R had been thoroughly cross-examined regarding his most recent statement. Airman R was asked if he provided the statement as a result of individual defense counsel's pretrial interview. His response was as follows:

No, sir, that's the reason why I wrote it was [sic] because I was asked to give a polygraph.

The military judge immediately instructed the members to disregard the witness' response as to why he gave the statement. In response to the judge's inquiry immediately thereafter, all of the members indicated that they could do so.

 Declaring a mistrial is solely within the discretion of the military judge; his decision will not be reversed unless there was a clear abuse of discretion. *United States v. Rosser*, 6 M.J. 267 (C.M.A.1979); *United States v. Thompson*, 5 M.J. 28 (C.M.A.1978); *accord, United States v. Rebuck*, 16 M.J. 555 (A.F.C.M.R.), *pet. denied* (C.M.A.1983). A mistrial is a drastic remedy and should not be granted unless there is a manifest necessity to terminate the trial to preserve the ends of public justice. *United States v. Jeanbaptiste*, 5 M.J. 374 (C.M.A.1978). We hold that the military judge did not abuse his discretion in denying the motion.

 Where the situation involves the improper admission of testimonial evidence, the usual corrective action is to order the testimony stricken and to instruct the members to disregard it. As the Court instructed in *United States v. Patrick*, 8 U.S.C.M.A. 212, 24 C.M.R. 22, 25 (1957):

> Only in the extraordinary situation, where the improperly admitted testimony is inflammatory or highly prejudicial to the extent that the impact cannot be erased reasonably from minds of an ordinary person, is there occasion for the Law Officer to grant a motion for a mistrial.

In a case akin to the one *sub judice,* the Court sustained the denial of a mistrial where the Government's key witness, during cross-examination by defense counsel, said, "I would like to bring out to the defense that I did willingly submit to a polygraph test." The Court stated that the law officer's actions of ordering the testimony struck and instructing the members to disregard it were proper; and that denying the motion for a mistrial was not an abuse of discretion. *United States v. Wolf,* 9 U.S.C.M.A. 137, 25 C.M.R. 399 (1958).[3]

Unlike the witness in *Wolf,* Airman R's testimony does not state that he, in fact, took a polygraph. The members would have had to infer that fact as well as the possible results. We find no basis in the record from which we may infer that the members did not follow the military judge's instruction. Airman R's comment was neither inflammatory nor prejudicial. We are also convinced that there was no concerted effort by the assistant trial counsel to bring inadmissible evidence before the court. *See United States v. Ledlow,* 11 U.S.C.M.A. 659, 29 C.M.R. 475 (1960); *United States v. Driver,* 35 C.M.R. 879 (A.F.B.R.), *pet. denied,* 35 C.M.R. 478 (1965); *cf. United States v. Dolan,* 17 U.S.C.M.A. 476, 38 C.M.R. 274 (1968) (prosecution's use of polygraph results was one of several errors in the case, the crucial error being the Board of Review's erroneous reliance on the polygraph results).

B. Improper Use of Rule 304(f) Testimony

 The accused also contends that the military judge erred in denying a second motion for mistrial. The motion was made after trial counsel, in open court, made reference to the accused's testimony in an earlier 39a, 10 U.S.C. § 839(a) session; at that time, the accused had testified for the limited purpose of contesting the voluntariness of his inculpatory statement to Detective H.

The exchange in open court leading to the motion was quite brief:

> Q. They would put you in a cell.
>
> A. They would put me in a cell.
>
> Q. [Referencing the earlier 39a session on contesting voluntariness] Well, didn't you testify in this court a few days ago that he [Detective H] said he could put you in jail, not would, don't you recall your testimony?
>
> A. At the very beginning of the interview he said it.

---

**3.** We note that *Wolf* was decided during the period that the Manual for Courts-Martial specifically excluded polygraph results from admission into evidence.

An objection was duly interposed, and the motion for mistrial made in a 39a session.

The basis of this assignment of error is Mil.R.Evid. 304(f). It provides, in part, as follows:

> An accused may testify for the limited purpose of denying ... that the statement was made voluntarily. Prior to the introduction of such testimony by the accused, the defense shall inform the military judge that the testimony is offered under this subdivision. When the accused testifies under this subdivision, the accused may be cross-examined only as to the matter on which he or she testifies. *Nothing said by the accused on either direct or cross-examination may be used against the accused for any purpose other than in a prosecution for perjury, false swearing, or making a false official statement.* (emphasis added).

Assuming, *arguendo,* that the cross-examination of the accused was improper, we are, nonetheless, convinced that he suffered no prejudice. We are also convinced that the trial counsel's action was the result of an error in judgment rather than prejudicial misconduct. *See United States v. Valencia,* 1 U.S.C.M.A. 415, 4 C.M.R. 7 (1952); *United States v. Daugherty,* 38 C.M.R. 820 (A.F.B.R.1967). The record of the 39a session on the motion for mistrial reflects trial counsel's incredulity that an accused could conceivably alter his testimony with impunity. Additionally, the accused did not admit an inconsistency, and individual defense counsel specifically declined a curative instruction. He requested, instead, that trial counsel be directed to withdraw the ques-

tion in open session. Upon reconvening, trial counsel did so.

Assessing the cumulative impact of the two events discussed in A and B, above, we are still convinced that a mistrial was not required to preserve the fairness of the proceedings, *United States v. Jeanbaptiste, supra,* and that the military judge did not abuse his discretion in denying the motions.[4]

## IV MOTION TO STRIKE

The accused's next assignment of error is that the military judge erred in denying a motion to strike the testimony of Airman R as a result of his asserting his right against self-incrimination during cross-examination. We hold that the military judge did not abuse his discretion in denying the motion.

The record reveals a series of questions leading up to Airman R's refusal to discuss either (a) his other encounters with illegal drugs; or (b) the identity of those who used marihuana during those encounters. The specific excerpts follow:

Q. ... [D]idn't you tell Agent Cooper that—well, the night before, 24 December, "I saw Lonnie Gast, and Lonnie Gast had a small piece of hash, and Lonnie said he'd gotten it from Dennis." Do you recall telling Agent Cooper that?

A. Yes, it's on my statement.

\* \* \* \* \* \*

Q. That statement is under oath, isn't it?

A. That's right.

---

4. Rule 304(f) is an implementation of Rule 104(d), which reads as follows:

> Testimony by accused. The accused does not, by testifying on a preliminary matter, become subject to cross-examination as to other issues in the case.

Rule 104(d) is taken without change from the Federal Rules. Applying *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Eleventh Circuit has held that Federal Rule 104(d) does not preclude the use of an inconsistent statement given at a suppression hearing to impeach a defendant's trial testimony, regardless of whether it was given on direct or cross-examination. *United States v. Quesada-*

*Rosadal,* 685 F.2d 1281 (11th Cir.1982). Mil.R. Evid. 304(b) adopts *Harris v. New York, supra,* but it is unclear on whether the President limited the extent of its adoption.

Our concern is that allowing testimony given under Rule 304(f) to be used in a subsequent trial for perjury is an insufficient deterrent to the giving of false testimony. Accordingly, we recommend that the drafters review Rule 304(f) and consider a change which would allow the use of inconsistent testimony given at a 39a session on the issue of voluntariness, at least when the accused is testifying before the members on the same issue.

Q. Do you recall being in my office the other day?

A. Yes.

Q. The first time I talked to you.

A. Yes.

Q. I questioned you about your seeing Lonnie Gast with that hash on 24 December, didn't I?

A. No.

\* \* \* \* \* \*

Q. Didn't I ask you some questions, ... isn't it a little bit funny that he would do that, and I asked you about that statement, didn't I?

A. No, you did not, you sure didn't.

Q. That statement about Lonnie Gast having the pot on 24 December?

A. You didn't ask me a thing on it.

Q. Well, why did you feel it necessary to go over [to AFOSI] and in your disclosure statement kind of change what happened there on 24 December, I mean on 15 June you say "On 24 December Gast gave me a piece of this hash, about a gram or so of it. At the time I did not want to get him in trouble so I did not turn the hash in like I should have. That evening, Glenn Loomis and I went to the pub and smoked up the hash." That's what you said on 15 June, wasn't it?

A. That's right.

Q. And what you had in your earlier statement about Lonnie Gast showing you the pot on 24 December and saying he got it from Dennis, in your new statement you put it on 23 December; do you recall 15 June [the 15 June statement] saying on 23 December 1981, "I went over to Gast's room. Jim Yancey was there ... they were getting ready to go out for a cruise to get high." ... "Gast had approximately four ounces of hash on him that evening and again he said he obtained it from Tech Sergeant Dennis." You changed what was earlier in your statement on the 24th to say it happened on the 23rd, and then you add a whole new incident [the cruise] and acknowledge that "Yes, I could have gotten some hash from somewhere else on 24 December." Now, why would you go over and

change that statement after talking to me the other day for the first time, when I asked you questions about this?

A. I made a disclosure statement.

\* \* \* \* \* \*

Q. Well, your memory was better back on 6 January 1982 about something that had occurred on 24 December than it was six months later on 15 June, wasn't it, or was your memory better on 15 June because you hadn't smoked pot for a while and your mind wasn't as hazy?

A. Oh, I remembered better on that day, yes.

\* \* \* \* \* \*

Q. On the 15th of June you remembered better than you had on 6 January?

A. That's right.

Q. Well, what do you attribute that to, is it because you had quit smoking, that you were still smoking pot back there around December and January and your memory cells were smoked out or something, but you quit and now your mind is clear again, is that right?

A. No.

Q. That's not why, is it because you'd been smoking pot all through May and June of this year too, haven't you?

A. No.

Q. You haven't? On your statement of 15 June do you recall saying that—

A. I'd rather you not discuss those other ones.

Q. You don't think they apply here, huh?

A. They don't apply to this case, no.

Q. But they are incidents where you've smoked dope—

At this point, the military judge advised that a 39a session was in order. After the military judge informed Airman R that he could not be forced to answer any incriminating questions, Airman R replied as follows:

It's not that, I just, you know, it still has nothing to do with the case plus these names, I'd rather not put in those, I'd rather not let anyone know about.

The defense then moved to strike his entire testimony, but the motion was denied.

Whenever a witness asserts the privilege against self-incrimination during cross-examination, the military judge, upon motion, may strike the direct testimony in whole or in part, unless the matter to which the witness refuses to testify is purely collateral. Mil.R.Evid. 301(f)(2). This rule incorporates the prevailing civilian rule that asserting the right against self-incrimination may deny the adverse party the right to confront the witness against him *via* cross-examination. *United States v. Colon-Atienza,* 22 U.S.C.M.A. 402, 47 C.M.R. 339 (1973).

However, the right to have a witness' direct testimony stricken because of an assertion of the right against self-incrimination is not absolute, *i.e.,* the mere fact that a witness refuses to answer a question on the ground of self-incrimination does not automatically require striking the witness' direct testimony. *United States v. Richardson,* 15 M.J. 41 (C.M.A.1983). Generally, the refusal to answer questions relating to a collateral matter does not require the striking of the witness' direct testimony. *United States v. Richardson, supra.*

We have held previously that a matter is collateral when the cross-examination is directed towards the witness' general credibility rather than to the specific events of the offense charged. *United States v. Terrell,* 4 M.J. 720 (A.F.C.M.R.1977), aff'd, 6 M.J. 13 (C.M.A.1978); *see United States v. Ravenel,* 48 C.M.R. 193 (A.F.C.M.R.), *pet. denied,* 48 C.M.R. 1000 (C.M.A.1974) (if witness asserted right against self-incrimination on offenses unrelated to direct evidence against accused, direct testimony would not be lost); *United States v. Varcoe,* 46 C.M.R. 1282 (A.F.C.M.R.1973) (witness asserted right against self-incrimination and declined to identify persons to whom he transferred remainder of LSD obtained from accused).

Determining whether the accused's right to a full cross-examination has been imped-ed, thereby requiring the witness' direct testimony to be stricken, is a matter within the sound discretion of the military judge. *United States v. Lawless,* 13 M.J. 943 (A.F. C.M.R.1982).

Ordering the direct testimony stricken is usually appropriate when the witness' assertion of the right against self-incrimination reaches the core of the direct testimony, or prevents a full inquiry into the credibility of the witness. M.C.M., p. A18–10. Therefore, the question confronting us is whether Airman R's refusal to answer reached the core of his direct testimony or prevented a full inquiry into his credibility. We think not. We hold that the questions he refused to answer went only to his general credibility as a witness.

As reflected in the excerpts, above, Airman R had been cross-examined extensively at the time he indicated his disinclination to answer the questions. In earlier testimony, he had admitted to extensive drug usage. The core of the defense's case at trial was that the matters charged against the accused never happened; Airman R was, in short, lying. One of the key instruments in the defense's case was the 15 June statement of Airman R. The excerpts indicate that defense counsel was asserting that this statement, when compared to an earlier statement by Airman R, contained "new revelations" which the defense asserted were recently fabricated. It was also asserted that defense counsel's pretrial interview was the impetus for the 15 June statement.[5]

Although he was urging the theory of R being a liar, the trial defense counsel argued to the military judge that the purpose of the defense's question was to demonstrate that R could not accurately perceive events because he had smoked marihuana after being recruited by AFOSI as an informant. The 15 June 1982 statement revealed that he had "smoked" during the period, as well as having received hashish from another person; and that he did not

---

5. The reader will probably surmise that this exchange during cross-examination, in effect, planted the seed for Airman R's comment during redirect examination concerning a polygraph examination, which was discussed in Part III–A, above.

surrender the hashish to Special Agent C. These facts were admitted by R in earlier cross-examination. These were crucial admissions, because they provided a possible alternate source for the marihuana which Airman R claimed to have received from the accused, as well as reflecting on his credibility.

Airman R was being questioned on the contents of the statement when he said, "I don't want to talk about it." The fact of the matter is, however, that after the 39a session, the defense probed the area which he was covering at the time Airman R declined to answer. The following is illuminating:

Q. And when you got in situations where hash would be around, he [Special Agent C] instructed you to simulate using hash, right?

A. That's right.

Q. Is that what you did?

A. That's right.

Q. Every time?

A. Yes.

* * * * * *

Q. Now, earlier in my cross-examination, I asked you, on 15 June did you say, "That evening Glen Loomis and I went to the pub and we smoked up the hash;" did you simulate that night?

A. I sure did.

Q. You did, and earlier I pointed to the part in your statement which you said was true, that "On 23 December Jim Yancey and Gast and myself met, so we got in the car and drove off. When we got out in the main road, Gast filled a can up with hash. We all took hits off of it." You simulated that time too, right?

A. That's right.

Q. Are you saying now that when at the 32 [Article 32 Investigation] you said "I'm still working for the OSI and I have not used any hash since 11 December 1981," was that a true statement?

A. It was at the time but I had forgotten about the incident on the 13th.

Q. Ah, okay, you had forgotten about the 13th, and you simulated on all the other occasions, is that right?

A. Correct.

* * * * * *

Q. Now, on 3 January, you didn't really smoke pot with a couple of people, did you.

A. I simulated.

Q. Simulated, so you say "That same afternoon we smoked several bowls out of his pipe." You simulated, right?

A. That's right.

* * * * * *

Q. Airman Richards, there's nothing in your statement that talks about simulating on 15 June, is there?

A. No.

Q. The word "simulate" is not even mentioned in there, is it?

A. No.

Q. I guess that it is just understood, right?

A. That's right.

We cannot overemphasize the fact that *all* of the excerpts set forth above represent only a small portion of Airman R's cross-examination. Additionally, the 15 June statement was admitted into evidence, which means the triers of fact had it during their deliberations.[6] This statement contained, in part, the following:

a. Information that an Airman Ry had smuggled hash from Holland into England, and that Ry shared some of his marihuana with Airman R, Gast, and an Airman D.

b. Information that Airman R observed Ry sell a quantity of hash to an unnamed person in addition to the "cruise" in a car where hash was smoked.

c. Information where Airman R observed other airmen using marihuana. The only persons not named were those whom he knew only by sight.

**6.** We do not suggest that a witness can frustrate cross-examination by merely relying on a pretrial statement.

In *United States v. Colon-Atienza,* 22 U.S.C.M.A. 402, 47 C.M.R. 336 (1973), the informant-witness refused to answer all questions relating to his own drug habit and his access to sources of drugs other than the accused. The cases relied upon by the Court in *Colon-Atienza* emphasized the fact that assertion of the right against self-incrimination during cross-examination had foreclosed the defense from developing areas independent of the informant, *i.e.,* other witnesses who could either confirm or deny the informant's testimony as well as testify concerning the informant's credibility.

In *United States v. Rivas,* 3 M.J. 282 (C.M.A.1977), the witness refused to answer all questions which may have established deeper involvement in the charged offense than mere presence at the scene of the offense.

Contrary to the situations in *Colon-Atienza* and *Rivas,* Airman R answered all questions relating to his activities with the accused. Additionally, a factor common to both *Colon-Atienza* and *Rivas,* is that the defense counsel did not have access to any other means of eliciting the information they sought. *Unlike those situations, defense counsel in the case sub judice had Airman R's sworn statement which contained all of the information he sought to elicit.* Airman R had, in fact, testified on the area; thus, the defense was not foreclosed from ferreting out witnesses who could possibly contradict Airman R.[7] Indeed, some of the persons mentioned by Airman R during his testimony and in the statement were, in fact, called by the defense.

Our review of Airman R's cross-examination in its entirety convinces us that his refusal to answer the referenced questions did not go to the core of his direct testimony. Also defense counsel was not prevented from testing Airman R's credibility. The excerpts from the record reflect clearly that defense counsel thoroughly probed the issues of whether Airman R was using marihuana during the period when the accused allegedly committed the charged offenses, and whether Airman R fabricated portions of his 15 June statement after his pretrial interview by defense counsel.

We have carefully considered the evidence of record. We hold that the military judge did not abuse his discretion in refusing to strike the testimony of Airman R. *United States v. Lawless, supra. See United States v. Hornbrook,* 14 M.J. 663, 668 (A.C.M.R.1982), *aff'd,* 16 M.J. 195 (C.M.A. 1983). Given the totality of Airman R's testimony on both direct and cross-examination, we perceive little danger of prejudice to the accused. Accordingly, we conclude that the accused suffered no harm by Airman R's refusal to answer the two questions during cross-examination.

## V MULTIPLICITY

■ The accused next complains that the military judge erred in instructing the members that the maximum punishment was 30 rather than 25 years of confinement. We disagree. The facts disclose that the accused did not transfer or consume the entire amount of marihuana which he possessed on 25 December 1982. Accordingly, the specification of transfer on that date did not merge with the specifications alleging possession and use, which were ruled to be multiplicious. *United States v. Harvey,* 12 M.J. 501 (A.F.C.M.R.1982). Additionally, we are convinced that the accused would not have been treated any more leniently by the court even if the maximum confinement had been 25 years. *United States v. Jean,* 15 M.J. 433 (C.M.A.1983); *see United States v. Doss,* 15 M.J. 409 (C.M.A.1983).

## VI POST–TRIAL DELAY

■ The accused's final assignment of error is that there was excessive delay in the post-trial processing of his case. The prejudice claimed is the fact that the accused has been in continued confinement. Accused's argument asks that we apply the

---

7. We refer to witnesses whom Airman R claimed were present when the accused committed some of the charged offenses.

now defunct presumption of prejudice of *Dunlap v. Convening Authority,* 23 U.S.C. M.A. 135, 48 C.M.R. 751 (1974). This we decline to do.

The accused alleges that the Government is responsible for 125 days of the total period between announcement of sentence and the action of the convening authority. Considering the fact that this record of trial is almost 700 pages long, that the issues litigated at trial are complex, with one being unprecedented, and the length of the staff judge advocate's review, we do not believe that the delay in this case was excessive, oppressive, or prejudicial to the accused. He has suffered no demonstrated prejudice; accordingly, no relief is merited. *United States v. Banks,* 7 M.J. 92 (C.M.A.1979).

## VII SENTENCE APPROPRIATENESS

The accused's use of marihuana with and transfer of marihuana to lower ranking airmen was a total abdication of his responsibilities as a noncommissioned officer. However, there is no indication that the accused reaped any profit from his transfers of marihuana. Considering this factor with the accused's prior service, we conclude that, although his conduct was very bad, it did not descend to the level of dishonorable. Accordingly, we will mitigate the dishonorable discharge to a bad conduct discharge. The sentence is otherwise approved.

## VIII

Having found no prejudice to the substantial rights of the accused, the findings of guilty and the sentence, as modified, are

AFFIRMED.

KASTL, Senior Judge, and RAICHLE, Judge, concur.