## UNITED STATES

v.

**Staff Sergeant Delton L. GHENT, FR 267–88–0268, United States Air Force.**

**ACM 24777.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 8 Feb. 1985.

Decided 25 Oct. 1985.

Appellate Counsel for the Accused: Colonel Leo L. Sergi and Major William H. Lamb.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert, Lieutenant Colonel Donal F. Hartman, Jr., and Second Lieutenant Donna M. Burton, USAFR (On the Brief).

Before SESSOMS, CANELLOS and CARPARELLI, Appellate Military Judges.

## DECISION

CANELLOS, Senior Judge:

Appellant was charged with raping B, a Navy Petty Officer Third Class, on 3 September 1984 and attempted murder of Staff Sergeant Aaron Smith on 5 October 1984. Upon motion by the government and over appellant's objection, the first trial ended in mistrial. The military judge based this decision on defense counsel's questioning of the rape victim "regarding the possible illegitimacy of her son." The military judge found this violated Mil.R. Evid. 412 and determined a curative instruction to the court members was insufficient. During the second trial, before a different military judge, defense counsel unsuccessfully moved to dismiss both charges based on former jeopardy. We find that the military judge in the first trial erred in declaring the mistrial, thus former jeopardy precluded retrial.

On the evening of 1 September 1984 Petty Officer B first met the appellant in the Homestead Air Force Base, Florida NCO Club. At that time appellant invited her to his quarters the next day and to a barbeque on Labor Day, 3 September. Petty Officer B went to appellant's quarters as planned and there met appellant's 19 year old nephew, a person known as D.J. She returned on Labor Day for the party, accompanied by her four year old son, and later in the day had consensual sex with D.J. in appellant's bedroom. When D.J. left the room, appellant entered and, according to her, raped her.

On 5 October 1985, during an office party, appellant assaulted Staff Sergeant Smith with a knife, cutting him severely in four places. Because of our holding in this case, we need not elaborate on the facts of this incident except to note that the two

charges involve different victims, at different times, and in totally unrelated circumstances.

During cross-examination of the rape victim at the first trial, the defense counsel asked whether the victim's present husband was the father of her son. She replied in the negative. The trial counsel immediately asked for an Article 39(a), U.C.M.J., 10 U.S.C. § 839(a), session and there moved for mistrial, arguing that the question raised improper innuendo concerning the previous sexual experiences of the victim and was inadmissible under Mil.R. Evid. 412. He added that defense counsel had attempted to show racial bias by asking whether the victim was the only white person at the appellant's party. The defense opposed the motion, arguing that trial counsel's earlier questions concerning the victim's marital status and her son's birthdate had opened the door to this testimony and that it *had not been established whether the victim's son was or was not illegitimate.* In ruling on the motion, the military judge specifically stated that the racial issue had "absolutely no bearing on [his] ruling." The judge then granted the motion, ruling as follows:

> Having observed the demeanor of the witness, who comes across as a rather tough, hard person, and the nature of her relationship with D.J., prior to the alleged rape, I find that bringing testimony before the court regarding the possible illegitimacy of her son, is a violation of Rule 412. I'll further find that had this been brought to my attention after notice to the prosecution, in a 39(a) Session, I would have ruled that that would not be an area which the defense could explore on cross-examination. And, lastly, I'm satisfied that, under the circumstances, and particularly with this witness, no instruction could cure the error.

**1.** *Benton v. Maryland,* 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969).

**2.** "[N]or shall any person be subject for the same offense to be put twice in jeopardy of life or limb." U.S. Const.Amend. V.

**I**

The principle that a defendant cannot be tried twice for the same offense traces its origins to Greek and Roman times and became established in the common law of England long before this Nation's independence.[1] The American formulation of this principle is embodied in the double jeopardy clause of the Fifth Amendment,[2] made applicable to courts-martial by Article 44(a), U.C.M.J., 10 U.S.C. § 844(a). The doctrine of double jeopardy not only ensures the finality of criminal judgments and prohibits multiple punishments for the same offense, but also safeguards a defendant's interest in avoiding the burdens of second prosecutions when the first was unnecessarily aborted before judgment.[3]

Once jeopardy attaches in a case, the accused gains a "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). This "valued right" merits constitutional protection for several reasons. First, a defendant has an interest in "being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *United States v. Jorn,* 400 U.S. 470, 486, 91 S.Ct. 547, 558, 27 L.Ed.2d 547 (1971). This interest arises with the selection and swearing of the jury panel and may intensify as the trial proceeds, particularly if the defendant senses the trial is going well and the fact finder is leaning toward acquittal.

Second, when a defendant is forced to abandon a trial in progress and undergo retrial, the prospects for acquittal may be lessened and "the risk that an innocent defendant may be convicted" may be enhanced. *Arizona v. Washington,* 434 U.S. 497, 504, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978). The opportunity to present the government's case a second time may per-

**3.** *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824).

mit the prosecutor to compensate for weaknesses exposed during the first trial, correct mistakes and generally strengthen his presentation. *Douglas v. United States,* 488 A.2d 121, 130 (D.C.App.1985).

Third, a second trial "increases the financial and emotional burden on the accused and prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing." *Arizona v. Washington,* 434 U.S. at 503–04, 98 S.Ct. at 829; *see also, Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

## II

 Although significant considerations weigh against declarations of mistrial over defense objection, this "valued right" is not absolute and must sometimes be subordinated to the public interest in affording a prosecutor one full and fair opportunity to present his evidence to an impartial jury. *Arizona v. Washington,* 434 U.S. at 505, 98 S.Ct. at 830; *see also, United States v. DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978); and, *Crist v. Bretz,* 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). If this were not so, "the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts the power to put the defendant to trial again." *Wade v. Hunter,* 336 U.S. at 689, 69 S.Ct. at 837. The Double Jeopardy Clause does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of criminal law in one proceeding. *Id.* Further, neither party has a right to have his case decided by a jury that may be tainted by bias. *Arizona v. Washington,* 434 U.S. at 516, 98 S.Ct. at 835. For these reasons, when courtroom errors or other developments at trial make a just trial impossible, the public's interest in maintaining the integrity of the criminal justice system will outweigh the defendant's right to obtain a judgment and the court may terminate the trial without defendant's consent and without foreclosing reprosecution. *Douglas v. United States,* 488 A.2d at 131; *see also, Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); and, *United States v. Jorn,* 400 U.S. at 480, 91 S.Ct. at 554.

 When a trial is terminated over objection of the defendant, the test for determining whether the doctrine of double jeopardy bars a second trial is found in *United States v. Perez,* 22 U.S. (9 Wheat.) 579 (1824). Mr. Justice Story articulated the rule:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is **manifest necessity** for the act, or the ends of public justice would otherwise be defeated. (emphasis added)

*United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580.

*But see, Oregon v. Kennedy,* 456 U.S. at 672, 102 S.Ct. at 2087 where this standard is not applied to cases where defense requests or acquiesces to mistrial.

 The words "manifest necessity" appropriately characterize the magnitude of the prosecutor's burden. R.C.M. 915.[4]

---

4. *Rule 915. Mistrial*

(a) *In general.* The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings. A mistrial may be declared as to some or all charges, and as to the entire proceedings or as to only the proceedings after findings.

(b) *Procedure.* On motion for a mistrial or when it otherwise appears that grounds for a mistrial may exist, the military judge shall inquire into the views of the parties on the matter and then decide the matter as an interlocutory question.

(c) *Effect of declaration of mistrial.*

(1) *Withdrawal of charges.* A declaration of mistrial shall have the effect of withdrawing the affected charges and specifications from the court-martial.

(2) *Further proceedings.* A declaration of a mistrial shall not prevent trial by another court-martial on the affected charges and specifica-

However, this standard cannot be mechanically applied. Most trials of any complexity commonly include evidence which was or could have been found objectionable by the trial court. "Our system is adversarial and vigorous advocacy is encouraged." *Oregon v. Kennedy*, 456 U.S. at 680, 102 S.Ct. 2092 (Justice Powell, concurring). Nonetheless, the trial judge must consider the particular problem confronting him and determine the existence of a high degree of necessity before concluding that a mistrial is appropriate. *Arizona v. Washington*, 434 U.S. at 506, 98 S.Ct. at 830. Although this standard does not require demonstration of absolute necessity, the reasons for aborting a trial must be sufficient to override the defendant's double jeopardy interests. *Douglas v. United States*, 488 A.2d at 132. A mistrial without defense consent is therefore justified "only in very extraordinary and striking circumstances," where it becomes impossible for the jury to reach an impartial verdict, or there is improper conduct of such a nature that a conviction would likely be reversed on appeal. *Id.* Even where there are circumstances which raise serious doubt regarding the fairness of the proceedings, the trial judge must, before granting a mistrial, determine that an alternative measure, less drastic than mistrial, would not alleviate the problem so as to allow the trial to continue to an impartial verdict. *United States v. Jorn*, 400 U.S. at 487, 91 S.Ct. at 558; *United States v. Dennis*, 16 M.J. 957 (A.F.C.M.R. 1983).

Decisions where appellate courts found manifest necessity for mistrial turn on factual determinations and escape meaningful categorization.[5] Properly granted mistrials conform to Justice Story's advice in *Perez* that the power to terminate a trial without the defendant's consent "ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes."

### III

We turn now to this court's charter in reviewing a claim of double jeopardy. An exhaustive and excellent discussion of appellate review criteria is found in *Douglas v. United States*, 488 A.2d at 133. The D.C. Court of Appeals succinctly defined the problem:

> [In cases like this] the Government bears a heavy burden to justify the mistrial decision. *Arizona*, 434 U.S. at 505, 98 S.Ct. at 830 ... [I]n determining whether a retrial is barred, a reviewing court must resolve any doubt 'in favor of the liberty of the citizen.' *Downum v. United States*, 372 U.S. 734, 738, 83 S.Ct. 1033, 1035 [10 L.Ed.2d 100] (quoting *United States v. Watson*, 28 Fed.Cas. 499 (S.D.N.Y.1868) (No. 16651)). Reviewing courts are obligated to 'scrutiniz[e]' mistrial decisions, *Somerville*, 410 U.S. at 462–63, 93 S.Ct. at 1069–70, and 'satisfy themselves that the trial judge exercised sound discretion in declaring a mis-

tions except when the mistrial was declared after jeopardy attached and before findings, and the declaration was:
 (A) An abuse of discretion and without the consent of the defense; or
 (B) The direct result of intentional prosecutorial misconduct designed to necessitate a mistrial.

5. However, consideration of some of these decisions is useful in illustrating the types of matters that traditionally create a "high degree" of necessity for a mistrial. *Arizona v. Washington, supra.* (prejudicial comment during defense counsel's opening statement to jury); *Illinois v. Somerville, supra.* (indictment discovered to be insufficient to charge a crime and not amendable under state law); *Brock v. North Carolina*, 344 U.S. 424, 73 S.Ct. 349, 97 L.Ed. 456 (1953)

(two important government witnesses invoked Fifth Amendment rights and refused to testify); *Wade v. Hunter, supra.* (military court martial in field discharged when Army's advance made attendance of witnesses impractical); *Thompson v. United States*, 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894) (juror found to have served on grand jury which indicted defendant); *Simmons v. United States*, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891) (letter published in newspaper rendered juror's impartiality doubtful); *United States v. Johnpier*, 12 U.S.C.M.A. 90, 30 C.M.R. 90 (1961) (improper testimony heard by jury); *United States v. Keenan*, 39 C.M.R. 115 (C.M.A. 1969) (information before court that accused had committed another serious crime); *United States v. Waldron*, 36 C.M.R. 130 (C.M.A.1966) (juror bias regarding witness testimony).

trial.' *Arizona,* 434 U.S. at 514, 98 S.Ct. at 835 (quoting *Perez,* 22 U.S. at 580.) *Douglas v. United States,* 488 A.2d at 133.

■ *De novo* consideration of the proof of manifest necessity on the record is not appropriate. Rather, the reviewing court ordinarily accepts a trial judge's determination that there is a high degree of necessity for a mistrial provided that determination is reasonable on its face. *Illinois v. Somerville,* 410 U.S. at 468, 93 S.Ct. at 1072; *Arizona v. Washington,* 434 U.S. at 510, 98 S.Ct. at 832. It is irrelevant that other trial or appellate judges might have continued with the trial. *Arizona v. Washington,* 434 U.S. at 511, 98 S.Ct. at 833. There are compelling institutional considerations supporting appellate deference to the trial judge's evaluation. He has seen and heard the witness. He observed the reaction of the court members. He is most familiar with the evidence and background of the case. He listened to the tone of argument and was "more conversant with the factors relevant to the determination" than any reviewing court could be. *Wade v. Hunter,* 336 U.S. at 687, 69 S.Ct. at 836. Further, impartial procedure would be impaired if the trial judge were deterred from exercising that power by a concern that any time an appellate court disagreed with his assessment of the trial situation a retrial would automatically be barred. He could not then properly perform his "duty, in order to protect the integrity of the trial, to take prompt and affirmative action to stop ... professional misconduct." *United States v. Dinitz,* 424 U.S. 600, 612, 96 S.Ct. 1075, 1082, 47 L.Ed.2d 267 (1976).

■ However, since a constitutionally protected interest is inevitably affected by a mistrial decision, the trial judge "must always temper the decision ... by considering the importance to the defendant of being able ... to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." To ensure protection of this interest, reviewing courts must satisfy themselves that the trial judge exercised "sound discretion" in declaring a mistrial.

*Arizona v. Washington,* 434 U.S. at 514, 98 S.Ct. at 834. Thus, if a trial judge acts irrationally, irresponsibly, precipitately or otherwise abuses his discretion, his decision to grant a mistrial cannot be condoned. *Id.* This is also the case where he has not engaged in sufficient inquiry to decide the issue. *United States v. Rosser,* 6 M.J. 267, 271 (C.M.A.1979). Without complete information, a judge cannot "assess all the factors which must be considered in making a necessarily discretionary determination regarding the jury's ability to render an impartial verdict." *Arizona v. Washington,* 434 U.S. at 510 n. 28, 98 S.Ct. at 832 n. 28. *See also, United States v. Rebuck,* 16 M.J. 555 (A.F.C.M.R.1983); and, *United States v. Jeanbaptiste,* 5 M.J. 374, 376 (C.M.A.1978).

■ Affirmative findings of fact are not required to support a mistrial declaration. *Arizona v. Washington,* 434 U.S. at 516–17, 98 S.Ct. at 835–36. However, the record must support (1) a reasonable conclusion that the events at trial were sufficiently serious to override the interests of the defendant in completing the trial, and (2) a determination that there were no "measures short of mistrial" that "might have sufficed to mitigate or cure any perceived undue trial prejudice" *Douglas v. United States,* 488 A.2d at 134. In the case before us, even if we accept the validity of the military judge's findings of fact, the record fails to support a conclusion that less drastic measures would not have sufficiently mitigated or even cured the perceived prejudice.

## IV

In response to the prosecution's motion, the military judge declared a mistrial as to both the rape and the attempted murder. The following analysis separately addresses these two charges. As to the attempted murder, the victim testified to the facts surrounding the assault before the declaration of mistrial. The government had, in fact, presented evidence on all elements of that offense when the mistrial was declared. No portion of the rape victim's

testimony, including the reference to the paternity of her son, bore any relationship to the attempted murder. Yet it appears from the discussion on the record that neither the trial counsel nor the trial judge considered the possibility of going forward to findings on this charge. The questioned "event" providing the basis for mistrial was an inquiry into the credibility of the rape victim. It is unreasonable to conclude that even thorough impeachment of this witness would have had the slightest effect on the charge of attempted murder. We can find no basis upon which to reasonably conclude that the declaration of a mistrial was manifestly necessary here. Clearly this is a case where measures far short of mistrial could have cured any remote possibility of undue trial prejudice. Having balanced society's interest in a fair hearing for the government and the accused's interest in having the matter decided once jeopardy has attached, we find there was no reason to declare a mistrial as to the attempted murder. We have, therefore, concluded that the military judge abused his discretion when he granted the mistrial as to this charge.

We do not intend to suggest that a defense counsel's efforts to impeach a rape victim by use of evidence which violates Mil.R.Evid. 412 may never justify the granting of a mistrial under R.C.M. 915. In the case before us, however, the victim merely testified that her son was born in 1980, before her present marriage, and was not the child of her present husband. As pointed out by the defense counsel, this did not establish the child's illegitimacy or the victim's promiscuity. From the transcript of the first trial we have no evidence either that the child was born during a previous marriage, adopted, or illegitimate. Without further inquiry, the military judge could not properly conclude the child was illegitimate. If it could be shown that the child was legitimate there would be no impact on the credibility of the witness. One simple question could have removed any question of prejudice to the government. Notwithstanding whatever innuendo of illegitimacy or promiscuity was created by the

defense counsel's question, when such innuendo is considered in the context of B's testimony on direct examination regarding her spontaneous and casual intercourse with the accused's teenage nephew, it is not reasonable to conclude that this innuendo would adversely and improperly affect the court member's opinion of the witness' credibility. Moreover, Mil.R.Evid. 412 is a "rape shield" provision designed to protect the victim from irrelevant attack and embarrassment. Declaration of a mistrial would ordinarily only aggravate the victim's position by necessitating another day in court and, thus, frustrate rather than support a fundamental reason for the rule. Although a violation of Mil.R.Evid. 412 might, in some circumstances, rise to a level severe enough to justify mistrial, there must be serious doubt about the fact finder's ability to reach a fair and impartial verdict. As discussed above, there is no basis for this conclusion in this case.

Were this a case where the accused requested or even acquiesced to the motion for mistrial, there would be no issue. However, the Supreme Court has specifically and unequivocally prescribed a much higher standard in cases where an accused's right to a verdict in one trial is interrupted by the declaration of mistrial over his objection. Our military rule defining the standards for declaring a mistrial has evolved from these cases. M.C.M., 1984, App. 21, (Analysis of Rule 915). After careful consideration of the doctrine of former jeopardy, its relationship to the granting of a mistrial over the objection of the defense and the evolution of case law on both points, we are compelled to conclude that the military judge abused his discretion. In this case, we are unable to find adequate support for the military judge's decision to grant the mistrial as to either charge. In short, there has been no showing of a "manifest necessity" justifying the judge's decision to grant the mistrial and abrogate the appellant's constitutionally prescribed "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter,* 336 U.S. at 689, 69

S.Ct. at 837. We do not lightly render this decision. We have, however, determined that it is Constitutionally mandated. *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979).

Given our conclusions on this issue, we need not consider the remaining assignments of error. The findings of guilty and sentence are set aside and the charges are dismissed.

SESSOMS, Senior Judge, and CARPARELLI, Judge, concur.

**UNITED STATES**

v.

**Airman First Class Lawrence JOHNSON, FR 577–72–4045 United States Air Force.**

**No. ACM 24626.**

U.S. Air Force Court of Military Review.

28 Oct. 1985.

Colonel Leo L. Sergi and Lieutenant Colonel Patrick C. Sweeney, for accused.

Colonel Kenneth R. Rengert and Colonel Andrew J. Adams, Jr., for the U.S.

Before HODGSON, FORAY, MICHAL-SKI, SESSOMS, CANELLOS, MURDOCK, O'HAIR and CARPARELLI, Appellate Military Judges.

CANELLOS, Senior Judge:

The accused was convicted, contrary to his pleas, by a court consisting of officer members, of unlawful entry, larceny, failure to obey a lawful order and resisting apprehension. The approved sentence extends to a bad conduct discharge, confinement for 18 months, forfeiture of $400 pay per month for 18 months and reduction to airman basic.

On appeal, the accused invites our attention to a motion made by the trial defense counsel to suppress evidence seized pursuant to an authorization to search issued by the commander, claiming the search authorization was not based on probable cause as required by Mil.R.Evid. 315(f)(2). We find that the prosecution failed to establish at trial that the search authorization was based on probable cause, and, as a result, the military judge erred in admitting the fruits of the search, over the objection of the defense.

In order to discuss this issue adequately, a review of the pertinent facts is necessary. On or about 10 February 1984, someone broke into the off-base apartment of an Air Force member and stole a stereo expander therefrom. The next day, at work, the victim was discussing the theft and the fact that she was going to report it to the security police so they could take fingerprints from the scene. In the midst of this conversation, the accused, who was a co-worker, made a statement questioning why someone would steal a stereo expander and yet not steal a large screen television set that was co-located with it. This seemed curious to the victim since the accused had never been inside her house and ostensibly did not know that she had such a T.V. In addition, the accused stated that it would do no good to take fingerprints since the security police did not have his fingerprints on file. These statements, coupled with the fact that she believed that the theft was probably perpetrated by someone in her office, and the fact that the accused had been a half hour late returning from his lunch on that date, caused the victim to suspect the accused. The victim did not report these suspicions to the security police until 28 February 1984. The next day, March 1 1984, she was interviewed by them. She provided all the above information as well as the fact that, although the accused lived in the barracks on base, he also lived with a U.S. Army member off-base, in the same general area as the victim.

On 1 March 1984, the security police investigator briefed the staff judge advocate as to the above information, and inquired whether there was sufficient probable cause to issue an authorization to search the accused's barracks room, car, and the home of the Army member. The staff judge advocate opined it was a close case but he believed there was sufficient probable cause to support these authorizations to search. He recommended that rather than searching immediately, it would be wise to await the return of the Army member, who was absent from the installation, and secure her permission to search.

The security police waited; however, on 6 March 1984, one day before the Army member was to return, they became suspicious that the accused was aware of their investigation and thought he might hide the stereo expander and therefore moved to search immediately. An authorization to search the accused's barracks room was

secured from his unit commander. Another authorization to search the Army member's home was secured from the base commander. The base commander had been fully briefed by the staff judge advocate on all the known facts surrounding the theft and the accused's probable involvement. The commander also knew the accused had a previous court-martial conviction for larceny, and his base exchange privileges had been revoked as a result.

A search of the barracks room was negative. When the security police arrived at the off-base quarters to effectuate a search there, they saw the accused exit carrying an over-sized gym bag, large enough to conceal the missing stereo equipment. When the accused observed the security police, he put the bag back into the house, closed the door and departed in his car. He was followed and apprehended as he was about to enter the installation. He was put in a detention facility, searched, and ordered to relinquish the key to the off-base quarters.

Unfortunately, none of the accused's suspicious activities at the quarters were reported to the base commander. Rather, the security police returned to the quarters, executed the search authorization they already had, searched, and discovered the stolen stereo range expander. The security police investigators candidly admitted they did not know where the stolen property was located. They suspected it could be in the barracks room, car or off-base quarters.

■ First, we find, as the prosecution conceded at trial, the accused had standing to raise the issue of the legality of the search at the off-base residence. Mil.R. Evid. 311(a)(2). Next, we find that the base commander was the proper official to issue an authorization to search the off-base residence, in this overseas location. Mil.R.Evid. 315(d)(1). Finally, assuming *arguendo*, that there was sufficient information presented to the commander to support the search authorization for alterna-

tive locations, we find that the information was stale. *United States v. Bright*, 2 M.J. 663 (A.F.C.M.R.1976). *See also*, 1 LaFave, Search & Seizure, Sec. 3.7(a) (1978). As a result of our finding that the information was stale, we find the authorization to search was not based on probable cause. Mil.R.Evid. 315(b)(1) and (2).

At trial, and on appeal, the government asserted that the fruits of the search were admissible alternatively as: a search based on probable cause (Mil.R.Evid. 315(f)(1) ); a search not requiring probable cause because of exigency (Mil.R.Evid. 315(g) ); a search falling within the "inevitable discovery" exception (*Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ); or a search falling within the "good faith" exception (*United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ).

■ Our discussion above addresses the first claim. Clearly there was insufficient probable cause to support the authorization to search in this case. Second, we find that there was no exigency. The accused was in custody and there was sufficient time for the security police investigators to provide the new information to the commander and to secure a new authorization to search. Third, we reject, out of hand, that the "inevitable discovery" rule is broad enough to cover the type of situation we have before us, where either (1) there was sufficient information available to support the authorization to search yet that information was not provided to the commander, or (2) where the homeowner would have granted permission to search but the police acted before requesting or receiving such consent.

■ Finally, we address the "good faith" exception. We find the "good faith" exception does not apply to trials by courts-martial governed by the Military Rules of Evidence, therefore, the evidence was not admissible on that basis. The Fourth Amendment [1] contains no provision precluding the

persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon

probable cause, supported by oath or affirmation, and particularly describing the place to be search, and the person or things to be seized.