**UNITED STATES, Appellee,**

v.

**Allen R. RICHARDSON, Specialist Four,
U.S. Army Appellant.**

**No. 41,938.**

**SPCM 14941.**

U.S. Court of Military Appeals.

Feb. 14, 1983.

For Appellant: *Captain Marcus C. McCarty* (argued); *Colonel Edward S. Adamkewicz, Jr., Major Raymond C. Ruppert, Major Joyce E. Plaut* (on brief); *Colonel William G. Eckhardt, Lieutenant Colonel R. Rex Brookshire, II, Major Paul J. Luedtke.*

For Appellee: *Captain Gary L. Hoffman* (argued); *Colonel R.R. Boller, Major John T. Edwards, Major Michael L. DeBusk* (on brief); *Captain Thomas E. Booth.*

*Opinion of the Court*

EVERETT, Chief Judge:

On March 13, 1980, appellant was tried at Schweinfurt, Federal Republic of Germany,

by a military judge sitting as a special court-martial. Contrary to his pleas, Richardson was found guilty of having wrongfully possessed and sold 2.39 grams of marihuana in the hashish form on October 30, 1979, in violation of Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934. His sentence to a bad-conduct discharge, confinement at hard labor for 5 months, and reduction to the grade of Private E–1, was approved by the convening authority. The United States Army Court of Military Review affirmed the approved findings and sentence without opinion and we granted review of this issue:

WHETHER THE TESTIMONY OF AN IMPORTANT DEFENSE WITNESS WAS IMPROPERLY STRUCK BY THE MILITARY JUDGE WHEN THE DEFENSE WITNESS INVOKED HIS FIFTH AMENDMENT RIGHTS ON A MATTER AFFECTING HIS GENERAL CREDIBILITY.

## I

As is common in drug prosecutions, here the Government's case rested primarily on the testimony of an informant who made a controlled buy and of the investigators who supervised the purchase. Specialist Four McKnight, the first witness for the prosecution, testified that towards the end of October 1979, he became "involved in a drug suppression operation" directed against appellant. On October 27, McKnight was told by appellant in a telephone conversation that he would soon be in possession of some drugs. Then, on October 30, "Specialist Richardson told me that he would have something later on." After reporting this information to the Criminal Investigation Division (CID), McKnight was in further contact with Richardson and "told him I would be over in a half an hour." McKnight was searched by the CID to determine that he was not already in possession of contraband and was furnished funds for the intended purchase; thereafter, he went to Richardson's room, where appellant was present with PFC Torres and another soldier. Between Richardson and Torres on

a bunk "was a big mirror or aluminum foil and approximately 80 pieces of hash." McKnight purchased a piece of hash from Richardson for $25.00 and immediately proceeded from appellant's room to the CID office, where the substance was field-tested.

On cross-examination, McKnight acknowledged that in September he had been in "trouble with the police" for breaking and entering a club; and soon thereafter he began working with the CID. Also, he described the details of his transaction with appellant on October 30. Then defense counsel asked whether McKnight had seen Richardson on November 9 and he replied in the affirmative. To another question McKnight responded that he had also seen Richardson in the latter's room the next day.

Special Agent Roger MacFarland testified that he was assigned to the Wildflecken CID office and on October 30 had been "involved in a drug suppression operation against" appellant. This operation had been preceded by several meetings with McKnight, who on the afternoon of October 30 had advised MacFarland that appellant had some hashish in his room at the barracks. MacFarland had assisted in a strip search to assure that McKnight "had no contraband on him" and then had provided the informant $25.00 in bills with recorded serial numbers. He observed McKnight enter the barracks where appellant's room was located and saw McKnight emerge, after being in the building for about three minutes, with "a tin foil wrapped packet containing a vegetable substance which was believed to be hash and which he stated he had bought from Richardson." Shortly thereafter, MacFarland "conducted a field test," which "was positive for marihuana," and he took a written statement from McKnight. According to the witness, he had not apprehended appellant at this time because he did not want to compromise his informant, McKnight. MacFarland also described how he mailed to the laboratory the evidence which he had received from McKnight. Without objection, the Government then offered into evidence a laboratory test report and rested its case.

The first defense witness was appellant's First Sergeant, who described in detail where appellant's room was located. This testimony apparently was adduced by defense counsel in order to demonstrate that the purchase of the hashish from appellant could not have been consummated during the short interval in which, according to MacFarland, McKnight had been in appellant's barracks. The First Sergeant's testimony also supported the defense theory that, instead of buying the hashish from appellant, McKnight previously had concealed it somewhere in the building where appellant's room was located, had retrieved it while purportedly making a controlled buy, and thereafter had claimed falsely that he bought it from Richardson.

Specialist Four Esmele testified that on October 30 he had been on duty with Specialist Richardson at the Wildflecken Dispensary. Esmele had not seen McKnight and his account of the events on October 30 was somewhat inconsistent with McKnight's version.

The defense also called PFC Joe Torres who, according to McKnight, had been in appellant's room when the controlled buy was made. However, Torres claimed that he was not present in Richardson's room on October 30 and had not even been in Wildflecken on that date. Torres also testified that in September 1979 McKnight, whom he knew slightly, "was busted downtown" and thereafter it was "pretty common knowledge" that McKnight was working for the CID. On cross-examination, the witness conceded that previously he had lied in statements to the CID about appellant's involvement.

Sergeant Leadum, who was assigned to Wuerzburg, testified that he had known appellant since 1977 and would see him occasionally "[a]s a friend visiting." About 7:30 or 8:00 p.m. on November 8, when Leadum "was on my way out," appellant "was coming in to visit me from off of leave." Since Leadum was "[g]oing to see my fiancee who is on the economy," he let appellant stay in his room. After that Thursday night Leadum did not see Richardson for about two weeks. Without objection from trial counsel, Leadum testified that his roommate told him that appellant left on Sunday afternoon, so it was this witness' "belief" that Richardson had stayed there in Wuerzburg until that time.

In response to the trial counsel's first question on cross-examination, Sergeant Leadum reiterated that he had known appellant since 1977. Then this colloquy ensued:

Q: How long have you known Specialist McKnight?

A: Specialist McKnight?

Q: McKnight, you don't know Specialist McKnight?

A: No.

Q: Okay. Have you ever had any dealings with Specialist McKnight in Wuerzburg before?

A: McKnight?

Q: Let me ask you in a different way. Weren't you a little surprised when you came up here to see McKnight testify against Richardson because you just made a sale of hash to him in Wuerzburg in the last month?

Immediately, defense counsel objected and told the judge that "the witness should be advised of any kind of rights before he answers that question." To this, the trial counsel replied:

Your Honor, I'm impeaching this witness on prior misconduct. I'm asking for prior misconduct which I have very good reason to believe that he has committed. It's not a foundationless accusation. Of course he does have the right to refuse to answer if he wants to.

The military judge then informed Sergeant Leadum of his privilege against self-incrimination and advised him that he was entitled to talk to an attorney before making a decision whether to answer the prosecutor's last question. When Leadum decided to do this, the judge temporarily excused him as a witness.

Thereupon, the defense called Specialist Jones, who had returned by plane to Frankfurt on November 8, 1979, after being on

leave in the United States. Appellant had been with Jones on the flight back to Frankfurt, where they took a cab to the train station. Richardson "was talking about going to Wuerzburg" and was not on the train that carried Jones from Frankfurt to Fulda enroute to Wildflecken.

Appellant testified in his own behalf that on November 8, 1979, he had been returning from leave and had left Specialist Jones at the Frankfurt train station, from which Jones had proceeded to Fulda and appellant to Wuerzburg. There he spent the night at Sergeant Leadum's room in the Wuerzburg MEDDAC Billets and slept most of the next day while recovering from "jet lag." On Saturday, November 10, he had just "messed around on post, see[ing] a few friends," and on Sunday he returned to Wildflecken. At about 10:45 p.m. on the evening of November 9, he called his unit and told them that he was back in Germany. Appellant denied that he had been in Wildflecken on November 9 or 10, although the CQ log of his unit recited that he had "signed in off of leave" on the evening of November 9. According to appellant, the government informant, McKnight, had lied when he testified that he had talked to appellant on the night of November 9 and around noon the next day. Likewise, Richardson denied that he had seen McKnight on October 30. According to appellant, he had been busy with his duties on that day and had not gone up to his room, where McKnight claimed the drug sale had taken place. Indeed, appellant denied emphatically that he had any hashish in his room on the evening of October 30.

After appellant's testimony, defense counsel stated that he rested; but the court responded that, before resting, the status of Sergeant Leadum should be ascertained. Thereupon, defense counsel informed the court that he had spoken with an attorney who was advising Leadum and who "right now does not wish him to be recalled as a witness and she does not want him answering any questions." Trial counsel then moved that, because he had been denied the opportunity to cross-examine, all the direct examination of Sergeant Leadum should "be struck from the record." Defense counsel argued briefly against this motion and concluded with the remark that "[t]he defense could always call up the roommate [of Leadum] if the question of Specialist Richardson being in Wuerzburg that night is in doubt." Without announcing his reasons, the judge granted the motion and stated, "I will disregard Sergeant Leadum's direct testimony." After this ruling, the defense rested without further ado.

In rebuttal, the Government recalled Special Agent MacFarland, who described certain prior inconsistent statements made by defense witness Torres.

## II

In deciding whether the military judge ruled properly in striking Sergeant Leadum's testimony, we start from the premise that a military judge may strike the testimony of a prosecution witness who, during cross-examination, has invoked his privilege against self-incrimination. Indeed, in *United States v. Rivas*, 3 M.J. 282 (C.M.A.1977), our Court held that the defense counsel had not rendered effective assistance to the accused because of his failure under the circumstances to move to strike the testimony of a prosecution witness. *Rivas* explained:

As a general proposition, when a witness refuses to answer questions on cross-examination, "the opportunity of thus probing and testing his statements [made on direct examination] has substantially failed, and his direct testimony should be struck out." 5 Wigmore, Evidence § 1391 (Chadbourn rev. 1974) (footnote omitted). This is because the right to confront an adverse witness, found in the Sixth Amendment of the Constitution of the United States, includes the right to cross-examine that witness. And as long as the subject matter of the cross-examination is germane to the direct examination or relates to the witness' credibility, cross-examination may extend to areas of self-incrimination. Of course, the witness may properly decline to answer such

questions, instead invoking his right not to incriminate himself. In such circumstance, the accused's usual remedy for this denial of his right to confront an adverse witness is to have that witness' direct testimony stricken from the record.

*Id.* at 285 (footnotes omitted).

Appellant suggests, however, that the Government does not enjoy a similar right to have stricken the testimony of a *defense witness* who has invoked his privilege against self-incrimination and refused to be cross-examined. This is true, according to appellant, because " 'due process' " does not give the Government an "equal right" with the accused "to cross-examine witnesses" and because "[t]he sixth amendment's guarantee of the right to cross-examine a witness is guaranteed to the accused, not to the government." Likewise, appellant points out that the Sixth Amendment grants to the accused, rather than the Government, a right to "compulsory process for obtaining witnesses." [1]

In light of *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), we are convinced that appellant's position is untenable. There the Supreme Court refused to allow a defense investigator to testify about statements which he had previously obtained from two prosecution witnesses, because the defense would not produce a copy of relevant portions of the investigator's report for use by the prosecution in cross-examining him. Repudiating an effort to create a double standard for government and defense witnesses, the Court emphasized, by quoting from *United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974):

"The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. *To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense."*

422 U.S. at 231, 95 S.Ct. at 2166 (emphasis added).

From the proposition that the Government and the defense should have equal access to evidence, the Court proceeded to the conclusion that neither party should be allowed to offer evidence that was misleading or untrustworthy. Thus, in rejecting a defense contention that the trial court's ruling had violated a defense work-product privilege, the Court observed that, while such a privilege exists in criminal litigation,

[t]he privilege derived from the work product doctrine is not absolute. Like other qualified privileges, it may be waived. Here respondent sought to adduce the testimony of the investigator and contrast his recollection of the contested statements with that of the prosecution's witnesses. Respondent, by electing to present the investigator as a witness, waived the privilege with respect to matters covered in his testimony. Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials *than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination.*

(Emphasis added.) *Id.* at 239–40, 95 S.Ct. at 2170 (footnote omitted).

Furthermore, with respect to an argument that Nobles had been deprived of his Sixth Amendment right to compulsory process, the Court remarked:

The [District] court's preclusion sanction ... merely prevented respondent from presenting to the jury a partial view of the credibility issue by adducing the investigator's testimony and thereafter refusing to disclose the contemporaneous report that might offer further critical

---

1. *See United States v. Vietor,* 10 M.J. 69, 73 (C.M.A.1980) (Everett, C.J., concurring in the result), for a discussion of some ramifications of the right to compulsory process.

insights. The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth. Deciding, as we do, that it was within the court's discretion to assure that the jury would hear the full testimony of the investigator rather than a truncated portion favorable to respondent, we think it would be artificial indeed to deprive the court of the power to effectuate that judgment. Nor do we find constitutional significance in the fact that the court in this instance was able to exclude the testimony in advance rather than receive it in evidence and thereafter charge the jury to disregard it when respondent's counsel refused, as he said he would, to produce the report.

*Id.* at 241, 95 S.Ct. at 2171 (footnote omitted).

■ "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); and to prevent cross-examination "calls into question the ultimate 'integrity of the fact-finding process,'" *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973), *quoting Berger v. California,* 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969), which quoted *Linkletter v. Walker,* 381 U.S. 618, 639, 85 S.Ct. 1731, 1743, 14 L.Ed.2d 601 (1965). The right of confrontation conferred upon a criminal defendant by the Sixth Amendment assures that he will have the opportunity to test prosecution witnesses by cross-examination. While the Government has not been granted a constitutional right to cross-examine defense witnesses, *Nobles*

makes clear that, like an accused, the prosecution is entitled to have a criminal case decided on the basis of trustworthy evidence.[2] Therefore, if cross-examination helps assure the trustworthiness of a witness' testimony, the Government should have the same opportunity to cross-examine defense witnesses that an accused enjoys with respect to prosecution witnesses. To allow an accused to offer evidence from witnesses whose veracity and powers of observation could not be tested adequately by cross-examination would grant him a privilege to mislead the trier of fact.

■ Article 46 of the Uniform Code, 10 U.S.C. § 846, directs that "[t]he trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." This language contemplates equal access to evidence for the prosecution and defense which also is prescribed by *Nobles.* The term "other evidence" in Article 46 is broad enough to include evidence obtained from adverse witnesses by means of cross-examination. Thus, it follows that if any witness—prosecution or defense—refuses to testify on cross-examination his testimony may be stricken. Indeed, the result would be bizarre if the Government lacked such a remedy when a defense witness like Sergeant Leadum testified on direct examination but refused to respond to cross-examination.

The right to have a witness' testimony stricken because of his refusal to answer questions on cross-examination is not unrestricted. Thus, Mil.R.Evid. 301(f)(2) does not give a party the right to strike the testimony of an opposing witness, when "the matters to which the witness refuses to testify are purely collateral." Although this Rule was not in effect at the time of

2. Not every right guaranteed to an accused by the Constitution exists solely for his benefit. Thus, the Government can insist on a jury trial, even when the defendant wishes to waive it. *Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965). Likewise, speedy trial and public trial do not benefit only an accused. *Cf. Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).

appellant's court-martial, it correctly purports to "incorporate[ ] the prevailing civilian rule"[3] and there is ample civilian and military precedent for this Rule. *See, e.g., United States v. Phillips,* 664 F.2d 971, 1027 (5th Cir.1981); *Dunbar v. Harris,* 612 F.2d 690 (2nd Cir.1979); *United States v. La-Riche,* 549 F.2d 1088 (6th Cir.), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 383 (1977); *United States v. Garrett,* 542 F.2d 23, 26 (6th Cir.1976); *United States v. Cardillo,* 316 F.2d 606 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963); *United States v. Phaneuf,* 10 M.J. 831 (A.C. M.R.1981); *United States v. Terrell,* 4 M.J. 720 (A.F.C.M.R.1977), *aff'd.,* 6 M.J. 13 (C.M. A.1978). Moreover, such a limitation on the right to strike a witness' testimony achieves a proper balance between the goals of having all material evidence considered by the trier of fact and assuring that all evidence considered is trustworthy. Indeed, if every refusal on grounds of self-incrimination to answer a question asked during cross-examination resulted in striking the direct testimony, a cross-examiner would be encouraged to harrass a witness with questions as to which he anticipated the witness might claim his privilege against self-incrimination.[4]

■ The Drafters' *Analysis* of Rule 301(f)(2) observes that a matter is "collateral" if it is "evidence of minimal importance (usually dealing with a rather distinct fact solicited for impeachment purposes)." In *United States v. Colon-Atienza,* 22 U.S.C. M.A. 399, 400, 47 C.M.R. 336, 337 (1973), the Court treated "collateral" matter "as [being] distinguished from invocation of the right in connection with questions dealing with 'the details of his direct testimony.' "

The Government maintains that, in the case at bar, cross-examination of Sergeant Leadum did not relate to a "collateral" matter. However, trial counsel's questions purported to be directed to impeaching Sergeant Leadum by showing that he had engaged in other misconduct. Indeed, the trial counsel advised the judge that he was seeking to impeach Leadum "on prior misconduct." Clearly, questions asked a witness about unrelated drug dealings in order to attack his credibility relate to a matter which is "purely collateral." *Dunbar v. Harris, United States v. LaRiche, United States v. Phaneuf, United States v. Terrell,* all *supra.*

Furthermore, all of Leadum's testimony concerned only a "collateral" issue—namely, Richardson's whereabouts on November 8, 9, and 10. Appellant could have been absent in Wuerzburg on November 9 and 10, just as Leadum testified, and still could have made the drug sale to McKnight in Wildflecken on October 30. Indeed, none of McKnight's testimony on direct examination dealt with events after October 30. The issue as to where Richardson had been after that time was first injected into the case by the defense counsel's cross-examination of McKnight.

The Government also urges that the cross-examination of Leadum did not concern "collateral" matters because it was directed to demonstrating that this witness was biased.[5] Obviously, this argument is something of an afterthought, having never been suggested by trial counsel. Moreover, even if the cross-examination tended to indicate that Leadum was biased in some manner because of an entirely unrelated drug transaction in which he had engaged with McKnight, the fact remains that this

---

**3.** *See* Drafters' *Analysis* of Mil.R.Evid. 301(f)(2), 8 M.J. XCII.

**4.** It would be especially harsh to allow striking a defense witness' direct testimony because of a refusal on self-incrimination grounds to answer questions propounded on cross-examination, for the Government, if it chose, could eliminate the basis for the refusal by granting the witness testimonial immunity.

**5.** According to this ingenious argument, Leadum was biased against the prosecution because he would wish to discredit McKnight and thereby cause the Government to lose confidence in the person who might be the principal witness against Leadum if he were court-martialed.

witness' entire testimony related only to a "collateral" matter.

We note also that if the Government really wished to demonstrate Leadum's "bias," it readily could have done so by means other than cross-examining him.[6] Indeed, McKnight could have been recalled to testify as to the relevant facts. Since the Government possessed other alternatives to establish Leadum's bias, its use of his refusal to answer questions on cross-examination as a basis for having his testimony stricken can hardly be justified as the only way to assure that the trier of fact was not misled by Leadum.

In sum, although in a proper case the Government, upon motion, may have stricken the direct testimony of a witness who, on grounds of self-incrimination, declines to answer questions asked on cross-examination, we are convinced that the questions asked Sergeant Leadum related only to a "collateral" matter and that the military judge erred in striking his testimony.

### III

■ Even constitutional error may not require reversal if beyond reasonable doubt it was harmless to the accused. *Cf. Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Ward*, 1 M.J. 176 (C.M.A.1975). Applying this principle, we conclude that the judge's error in striking Leadum's testimony was not prejudicial, even if it violated appellant's Fifth and Sixth Amendment rights.

Sergeant Leadum testified that he had personally seen appellant in his room on November 8, but that his roommate had told Leadum that appellant had stayed there until Sunday, November 10. This testimony about what Leadum's roommate

told him was hearsay and, under the Manual provisions existing at the time of appellant's trial, *see* para. 139a, Manual for Courts-Martial, United States, 1969 (Revised edition), this hearsay testimony was clearly incompetent as evidence, despite the absence of any objection thereto. *United States v. Jessen*, 12 M.J. 122 (C.M.A.1981); *United States v. Porter*, 7 M.J. 32 (C.M.A. 1979); *United States v. Neutze*, 7 M.J. 30 (C.M.A.1979); *United States v. Zone*, 7 M.J. 21 (C.M.A.1979). Since this evidence could not properly have been considered by the trier of fact, its striking could not have harmed appellant.

During argument on the government motion to strike Leadum's testimony, defense counsel acknowledged that he could call Leadum's roommate as a witness if appellant's presence in Wuerzburg was in doubt. However, after the judge granted the motion, the defense rested without either calling the roommate or asking for a recess or continuance in order to obtain his presence. Since, by its own admission, the defense possessed a ready substitute for Leadum's testimony, which it did not choose to use, we assume that the defense counsel attached little significance to that testimony; so we do not hesitate to take a similar view of its import.[7]

Of greater importance, even if McKnight erred about the dates in November when he claimed to have seen Richardson at Wildflecken, this mistake would have had little effect on the weight of his testimony about the sale on October 30—especially in light of the corroboration he received from Special Agent MacFarland. While we are aware of the maxim that a person who testifies falsely on one matter may be testi-

6. *See* Mil.R.Evid. 608(c), which, according to the Drafters' *Analysis*, 8 M.J. CLXXXVIII, was taken from paragraph 153d of the Manual for Courts-Martial, United States, 1969 (Revised edition).

7. According to a defense witness, a round trip between Wildflecken and Wuerzburg takes

about three hours by car. Apparently appellant could have spent the nights of November 9 and 10 in Wuerzburg and still have been in Wildflecken at the times McKnight stated he was present.

fying falsely as to others,[8] we do not believe that it is applicable to the present case. In short, we are convinced that if the trier of fact had not stricken Leadum's testimony and had considered it fully, he nonetheless would have reached the same conclusion as to appellant's guilt.

8. *Cf. United States v. Robbins,* 16 U.S.C.M.A. 474, 37 C.M.R. 94 (1966).

## IV

Since we are persuaded beyond reasonable doubt that the military judge's error did not harm appellant, the decision of the United States Army Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.