UNITED STATES, Appellee,

v.

Inez WILLIAMS, Specialist Five, U.S. Army, Appellant.

No. 43,799
CM 441286.

U.S. Court of Military Appeals.

Oct. 3, 1983.

For Appellant: *Colonel William G. Eckhardt, Major Robert C. Rhodes, Captain John Lukjanowicz* (on brief); *Colonel Edward S. Adamkewicz, Jr., Captain Mary R. Brady.*

For Appellee: *Colonel R.R. Boller, Lieutenant Colonel John T. Edwards, Captain Glenn D. Gillett, Captain Mark S. Julius* (on brief); *Captain Kenneth H. Clevenger, Captain Michael R. Smythers.*

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial consisting of military judge alone convicted appellant of assault with intent to commit murder, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934, and thereupon sentenced her to a dishonorable discharge, confinement at hard labor for 4 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the trial results and the Court of Military Review affirmed. We granted review to determine whether the military judge erred by refusing to strike the victim's testimony, upon timely defense motion, after the victim had invoked his fifth-amendment right to refuse to answer certain questions posed to him by defense counsel on cross-examination. We conclude that he did not.

I

After her arraignment on the charged offense of assault with intent to commit murder, Williams tendered a plea of guilty to the lesser-included offense of assault with a dangerous weapon. In the providence inquiry into this plea, appellant revealed that on the date of the incident, she "was on quarters" after having "just" been dismissed "from the hospital." However, she left her quarters and went, instead, to her work station at the electronics shop. There she promptly approached the Noncommissioned-Officer-in-Charge (NCOIC)— the victim herein, Sergeant First Class McClelland. When just a few feet from

McClelland, she pulled a small, loaded .38-caliber derringer from her pocket and pointed it at him. She had picked up this weapon in her room; and, "as far as . . . [she] knew," it was in "working" condition. She admitted to the judge that she had acted intentionally and without justification or excuse. Satisfied that appellant appreciated and admitted all the elements of assault with a dangerous weapon, and that the guilty plea thereto was based in fact, the military judge accepted the plea.

At this point, the Government proceeded to offer evidence on the charged offense. Clearly, the only point in dispute between the parties was appellant's intent when she pointed the derringer at McClelland. The Government, of course, urged that Williams intended to murder McClelland. The defense, on the other hand, seems to have proceeded on the theory that she either simply intended to frighten McClelland, so that she was guilty only of the aggravated assault which she admitted, or that, if she did intend to kill him, she acted in the heat of sudden passion caused by adequate provocation and was guilty only of assault with intent to commit voluntary manslaughter. See paras. 198a and 213f(1)(b), Manual for Courts-Martial, United States, 1969 (Revised edition).

Since, by her pleas, Williams already had admitted pointing the derringer at McClelland, the prosecution set out to carry its burden of proving her intent to kill by establishing (a) her motive for wanting to kill McClelland and, (b) the physical manifestations of her intent at the time of the assault. As to the former, the Government called as its first witness Military Police Investigator (MPI) Carol Downin. She testified that two days before the alleged assault she met and interviewed appellant at Irwin Army Hospital, Fort Riley, Kansas, where appellant then was a patient. Appellant reported that she and McClelland

had had "a physical altercation," during which the sergeant had thrown her to the floor, beaten her face, "held a knife to her" face, and threatened "to kill her."[1] Downin said that, when she saw appellant in the hospital, Williams seemed to be in pain. Moreover, appellant was wearing a neck brace and had scratches on her forehead caused by the knife and bruises on the eye and facial area that had resulted from the beating.

To demonstrate the manifestations of appellant's intent, the prosecution relied principally on threats to kill McClelland uttered by Williams before, during, and after her assault on him. Downin, for instance, testified that during her interview of appellant in the hospital, Williams "was very upset, and . . . angry" and "said she was going to kill" McClelland. According to Downin, appellant "said something to the effect that, 'I'm going to kill the bastard,' or 'If it's the last thing I do, I'm going to kill the bastard.'"[2]

Later in the trial, Specialist Five Johnnie R. Miller, a barracks neighbor of appellant and a member of her squad who had been present during the assault, testified that as she was pointing the derringer at McClelland, appellant uttered words to the "effect" of " 'I'm going to get you, you bastard you.'" Specialist Five Jeanette M. Aldrich, who also had been present, remembered that during the incident appellant said, " 'I'm going to kill you, you bastard.'"

Staff Sergeant John C. Brown, appellant's section chief and the last witness who saw the assault, testified that, to "the best of . . . [his] recollection," appellant told McClelland as she pointed the derringer at him, " 'I'm going to kill you before the end of the night,' or 'Before the end of the day, you are going to die.'"

CID Special Agent Mary Berens, called to the scene of the assault to investigate, testified that while she was preparing a waiver-

---

1. A later witness testified that appellant and McClelland had been "seeing each other" during the time period leading up to her assault on him.

2. Downin said that at the time she did not "take . . . [appellant's threat] seriously" because it was not uncommon for assault victims to be upset and to make such threats without "really" meaning them.

of-rights form before questioning appellant, Williams spontaneously stated, " 'I wish the gun would have went off, and then I would have shot him.' " Finally, Second Lieutenant Delinda Creal, a member of appellant's company, testified that, when she "took . . . [appellant] into a small office" and tried "to calm her down," appellant began repeating, " 'I'm going to kill him, I'm going to kill him.' " When Creal asked appellant if she felt well, Williams replied "that she would be feeling all right when she seen him pushing daisies."

As additional evidence of appellant's intent to murder McClelland, rather than merely to frighten him, trial counsel elicited testimony from Sergeant Brown that the derringer was fully cocked during the incident. To explain why appellant had not actually fired the weapon during the several seconds it was trained on McClelland, Lieutenant Creal indicated that, when she "told . . . [appellant] to sit down and calm" herself, appellant said, " 'I forgot to pull the trigger.' " Upon examination by the military judge, Creal responded that appellant's statement about pulling the trigger had been, " 'I forgot how to pull the trigger.' " [3]

After MPI Downin had testified but before any of the other prosecution witnesses had taken the stand, trial counsel called the victim as a witness. Besides describing the assault, which Williams herself admitted by her plea and described during the providence inquiry—and which also was fully treated by subsequent prosecution witnesses, McClelland contributed two pieces of evidence to the Government's case. First, he testified that he "heard the gun cock" when appellant pointed it at him and that he saw the thumb of appellant's right hand move backwards on the hammer of the pistol, so that it was cocked. However, as already has been indicated, Sergeant Brown

also testified that during the assault the derringer was fully cocked. In fact, in removing the weapon from appellant's hand, Brown had placed his thumb between the cocked hammer and the frame of the pistol to prevent it from firing.

Secondly, McClelland testified that, as Williams pointed the derringer at him, she exclaimed, " 'Son-of-a-bitch, you are going to die,' " and, as appellant was being disarmed, she kicked at him and said, " 'You bastard, before the day is over, you are going to die.' " Of course, as is quite clear from the earlier discussion, three other witnesses to the assault also heard appellant utter threats of a similar import.

On cross-examination, defense counsel elicited from McClelland that he then was "pending charges" which concerned "two incidents with" appellant. From the date involved we infer that one was the beating which Williams had reported to MPI Downin. When defense counsel specifically asked McClelland whether he had "assaulted . . . [appellant] on both [of those] occasions," McClelland declined to answer "on advice of [his] counsel" that to do so might "tend to incriminate" himself. Defense counsel received the same reply when he then asked, "In fact, you beat her up pretty bad, didn't you?"

At this point, defense counsel moved to have McClelland's direct testimony stricken from the record. He contended that he was permitted to delve into McClelland's bias as a witness and that McClelland's refusal to answer the questions denied appellant this opportunity. *See United States v. Rivas,* 3 M.J. 282 (C.M.A.1977). Trial counsel answered that in his view the extreme remedy requested was unnecessary. The court already had before it the substance of evidence which the defense wished to elicit—namely, that McClelland would be biased

---

3. Prosecution exhibit 1, the derringer used during the assault, has a small trigger protruding only slightly beyond two phalanges—one on each side of the trigger and parallel to it. In his rebuttal to defense counsel's closing argument, trial counsel suggested that a trigger configured in this manner might be difficult to pull. He submitted, "If the accused's finger is hooked around that [the phalanges], for instance, with the knuckle over the trigger instead of a smooth surface, she might pull as hard as she could—a bigger, stronger person than her might pull as hard as he could, and his force be expended on those phalanges rather than on the trigger itself."

against appellant because he could reasonably anticipate that she would be a government witness against him at any future court-martial on the charges pending against him and so he would have a motive to testify falsely in her trial.

After a recess during which the military judge considered the issue in light of the cases cited to him by counsel for each side, the judge ruled in this manner:

The ruling is based upon *U.S. v. Terrell*, 4 M.J. 720 [C.M.R.1977], especially at page 723, and the cases cited in the footnote on that page. The witness admitted that he's charged with two assaults on the accused. There has already been in evidence grounds showing bias, or basis for bias interest. Since the witness testified against the accused, I'm assuming the witness knows that the accused can and may very well testify against him. This also shows a basis for bias. And I'm not unmindful of the accused's plea of guilty, which admits most of what the witness said on direct, and waives the right to cross-examination as to the elements of assault with a deadly weapon. I find that the area that you inquired into is collateral and not an area into the specific events of the crime charged, and the motion is denied. However, later testimony could make the area material as to the offense, and I will allow the defense counsel to renew its motion at the close of the prosecution case, or [I] may do so *sua sponte*. And I may even allow the defense counsel to introduce extrinsic evidence of these two alleged assaults, depending upon how the remaining testimony goes.

## II

Mil.R.Evid. 301(f)(2) provides:

If a witness asserts the privilege against self-incrimination on cross-examination, the military judge, upon motion, may strike the direct testimony of the witness in whole or in part, unless the matters to which the witness refuses to testify are purely collateral.

The drafters of this provision explained in their *Analysis:*

This provision is new and is intended to clarify the situation in which a witness who has testified fully on direct examination asserts the privilege against self-incrimination on cross-examination. It incorporates the prevailing civilian rule, which has also been discussed in military cases. *See, e.g., United States v. Colon-Atienza*, 22 [U.S.] C.M.A. 399, 47 C.M.R. 336 (1973); *United States v. Rivas*, 3 M.J. 282 (C.M.A.1977). Where the assertion shields only "collateral" matters—*i.e.*, evidence of minimal importance (usually dealing with a rather distant fact solicited for impeachment purposes)—it is not appropriate to strike direct testimony. A matter is collateral when sheltering it would create little danger of prejudice to the accused. Where the exercise of the privilege reaches the core of the direct testimony or prevents a full inquiry into the credibility of the witness, however, striking of the direct testimony would appear mandated.

Appendix 18, p. A18–12, Manual, *supra.*

In *United States v. Richardson*, 15 M.J. 41 (C.M.A.1983), we concluded that the drafters were correct in asserting that this rule "incorporates the prevailing civilian rule" and that "there is ample civilian and military precedent for this Rule." We also opined that the "limitation on the" authority of the military judge "to strike a witness' [direct] testimony achieves a proper balance between the goals of having all material evidence considered by the trier of fact and assuring that all evidence considered is trustworthy." *Id.* at 47.

In *Richardson*, we determined that the questions which the trial counsel there wished to ask a defense witness about the witness' "unrelated drug dealings in order to" undermine "his credibility" were " 'purely collateral.' *Dunbar v. Harris*, [612 F.2d 690 (2nd Cir.1979), ] *United States v. LaRiche*, [549 F.2d 1088 (6th Cir.1977), *cert. denied*, 430 U.S. 987 [97 S.Ct. 1687, 52 L.Ed.2d 383 (1977),] *United States v. Phaneuf*, [10 M.J. 831 (A.C.M.R.1981), ] *United*

*States v. Terrell,* [4 M.J. 720 (A.F.C.M.R. 1977), *aff'd,* 6 M.J. 13 (C.M.A.1978)]." 15 M.J. at 47. Of course, not all questions designed chiefly to attack the credibility of a witness are necessarily "collateral." *See Drafters' Analysis, supra.* For instance, in the case at bar, if McClelland had been the only prosecution witness to testify about the circumstances surrounding the assault, no other evidence had been offered as to appellant's intent, and no other evidence had been available to establish McClelland's bias against appellant, then the witness' frustration of defense efforts to establish his bias might be judged to have "prevent[ed] a full inquiry into the credibility of the witness." *See Drafters' Analysis, supra.*

Those, however, are not the facts here. The questions to which McClelland asserted his right against self-incrimination went only to the matter of whether he had previously assaulted the appellant—a matter collateral to the question of appellant's intent at the time she pointed the pistol at him. Further, the military judge correctly recognized that the bulk of McClelland's testimony was cumulative to testimony already before him, or was based on facts that had been admitted by appellant's plea of guilty.

For example, her threats to kill McClelland and the fact that the derringer was cocked had been established by other witnesses and were unrebutted by the defense. Further, the military judge acknowledged that the possible reasons for McClelland to be biased against appellant already had been fully established through the testimony of MPI Downin and of McClelland himself, who did admit that charges were pending against him for the two incidents involving appellant. Under these circumstances, we doubt that McClelland's cumulative testimony had any effect on the military judge's verdict.

Therefore, we cannot agree that McClelland's refusal to respond to the line of questioning begun by defense counsel frustrated appellant's efforts to reveal that the witness was biased against her. Accordingly, the military judge did not abuse his discretion by refusing to strike McClelland's direct testimony.

### III

The decision of the United States Army Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.