UNITED STATES, Appellee,

v.

Geraldo P. MOORE, Staff Sergeant
U.S. Army, Appellant.

No. 67,342.
CM 9001414.

U.S. Court of Military Appeals.

Argued Oct. 1, 1992.
Decided March 11, 1993.

For Appellant: *Captain Paul H. Turney* (argued); *Lieutenant Colonel James H. Weise, Captain Robin N. Swope, Captain Michael W. Meier* (on brief); *Colonel Robert B. Kirby.*

For Appellee: *Captain Sheila E. McDonald* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell'Orto, Captain Timothy W. Lucas, Captain Gregory T. Baldwin* (on brief).

*Opinion of the Court*

WISS, Judge:

In a contested trial, a special court-martial composed of members convicted appellant of wrongful use of marijuana, *see* Art. 112a, Uniform Code of Military Justice, 10 USC § 912a, and sentenced him to a bad-conduct discharge, confinement for 6 months, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review affirmed by a divided vote, in an unpublished opinion dated August 8, 1991.

On appellant's petition, this Court agreed to consider whether, under rather unusual factual circumstances, the military judge erred in the remedy he selected when appellant's ex-wife invoked her Fifth Amendment right against self-incrimination at a certain point during her testimony.[1] Now we conclude beyond a reasonable doubt that any error in this regard was harmless.

I

When appellant returned from Christmas leave in December 1989, he provided a sample for urinalysis. When tested, the sample indicated 64 nanograms of tetrahydrocannabinol (THC) per milliliter of urine; the minimum required by regulations for a "positive" read is 15 nanograms per milliliter.

At the trial that ultimately ensued, appellant advanced the defense of innocent ingestion through food prepared by his divorced wife. The prosecution's case principally consisted of evidence of appellant's urinalysis results and the testimony of an expert witness relating to the circumstances under which marijuana or hashish could have been ingested in food in order to test at 64 nanograms per milliliter.[2]

---

1. The issue on which we granted review was: WHETHER THE MILITARY JUDGE ERRED BY STRIKING THE ENTIRE TESTIMONY OF APPELLANT'S WIFE AFTER SHE REFUSED TO ANSWER ADDITIONAL QUESTIONS BY ASSERTING HER RIGHT AGAINST SELF–INCRIMINATION.

2. Specifically, "[i]t would take a large amount; the urinalysis would have to be done within a short span of time" and "[t]he marijuana would have to be heat activated, because that's the only way it could release the THC into the system." The expert suggested that an "individual could only test positive after two or three days with two entire lids of hashish baked in the brownies." He also revealed that, "when marijuana is cooked in food," it gives off a distinctive odor, and the resin turns into a "gooey" tar and has "a bitter taste" that is "difficult" to mask.

In turn, appellant—a soldier of 13 years with a sterling record of accomplishments and citations—defended against the accusation by contending that his former wife, Carol Moore, with whom he was then living while the two of them considered reconciliation, had secreted marijuana or hashish in his food. The ostensible reason for her clandestine cookery was her hatred of the U.S. Army and what it had done to her family; he theorized that she knew that the marijuana would be detected, appellant would be forced to leave the Army (something that, otherwise, his single-minded dedication absolutely prevented), and they then could resume their marriage.

Appellant began this defense with his own testimony. He stated that, a few hours after he had been advised of his positive urinalysis, he began to suspect Carol. When he went home that evening, he confronted her with his test results and his suspicions. At first, she denied his allegation. Soon, though, she admitted that she was responsible, told him that "she was sick of the Army," and warned him to choose between her and his military career—at which point, she ran out of the house.

About 30 minutes later, Second Lieutenant (2Lt) Ayers (appellant's platoon leader), Staff Sergeant Hartley, and Sergeant Torberg arrived at appellant's house. Ayers explained that, after their argument, Carol had "called the whole chain of command." Ayers and the two sergeants talked to appellant in an effort to calm him down, while Carol stayed in the car. After an hour or two, she knocked on the door and told appellant that she needed something from the house, but appellant refused her entry. Appellant testified that, in response, she told him, "'I put it in all right; you're lucky it wasn't [DeCon].'"[3]

Carol herself followed appellant to the witness stand. In eight pages of recorded testimony, Carol revealed her strong anger about the Army and her husband's career in it, giving several examples of instances in which she "felt deserted" and from which she concluded that the Army does not "stand up for the military family." Finally, she divorced appellant in 1988, having too often felt "like it was the army or [her], and the army won again."

After the defense had well established Carol's feelings regarding the Army and its impact on her and her family, the following colloquy occurred between Carol and assistant defense counsel:

Q. Did you ever, in these conversations with your husband, did you ever threaten that you would do anything necessary to get him out of the army?

A. I'm going to take the Fifth Amendment.

Q. Okay. Were you told by the prosecutor that there was going to be an agent of the Clarksville Drug Task Force sitting here today taking notes?

A. Yes.

Q. Do you know who that is?

A. I assume that's who that is back there. (Indicating a man in the spectator section.)

Q. I've got several more questions. Let me ask you just one more. Did you put that marijuana in his food?

A. I take the Fifth Amendment. I may incriminate myself.

ADC: I have no further questions.

At this point, trial counsel asked for an out-of-court session. *See* Art. 39(a), UCMJ, 10 USC § 839(a). There, the prosecutor asked "that all her testimony be stricken. She's invoked the Fifth Amendment privilege as to the substantive issue of this case, and thus deprives the Government of any reasonable basis to cross-examine her upon the relevant matters, the material matters of the case." Assistant defense counsel answered, "They can literally cross-examine her all day long in terms of whether she liked the army or hated the army. I don't know what the basis is for striking the entire testimony."

---

**3.** That is a rat poison. Appellant testified that he thought she had said "Drano," but other witnesses recounted it as "DeCon." *See* opinion, *infra.*

Further questioning of Carol made abundantly clear that she was not "going to answer any question concerning how the marijuana got in [appellant's] system." After a good deal of exchange among the two opposing counsel and the military judge, trial counsel again argued the basis of the Government's motion, as follows:

> [I]n [*United States v.] Hill,* [18 MJ 459 (CMA 1984),] the court held that the judge correctly struck the direct testimony of the defense witness who stated in an Article 39(a) session that he would invoke that right against self-incrimination during cross-examination by the prosecution. And if you read the draft of analysis 2—301.f.2—it states, "Where the exercise of the privilege reaches the core of the direct testimony or prevents a full inquiry into the credibility of the witness, ... striking of the direct testimony would appear mandated." ... This goes to a core matter and one need only look further than the argument by defense counsel as to why her testimony was relevant. It goes directly to the core of what has occurred and her invocation of this privilege denies the Government of every substantial right and means to go against her. The Government is denied the use of an expert to inquire as to how she put it in, how much she put in, what time frame she put it in,

what day, in what foods, how did she disguise the taste. We can't produce an expert because she won't testify, so we have no means of testing anything she says. And for that reason the Government would ask that that entire testimony be stricken.

For her part, assistant defense counsel asserted that appellant's constitutional due-process "right to present [a] defense ... would outweigh any evidentiary rule." She complained that Carol's refusal to testify in this area was solely the product of a visit to her the night before by trial counsel, who had admonished Carol that, during trial, a local civilian law enforcement agent would be in the courtroom noting her testimony and that her own prosecution could follow, based on that testimony. Counsel pleaded that Carol's testimony that had been elicited prior to invocation of her privilege was "critical to establishing motive" to cook marijuana in appellant's food and that trial counsel was fully able to cross-examine Carol about that testimony. As to any questioning concerning whether Carol had, in fact, cooked marijuana in appellant's food, assistant defense counsel pointed out that Carol had invoked her privilege in that regard while under *direct* examination by the *defense* and that the defense was as much restricted as the prosecution with respect to that line of questioning.[4]

---

4. Defense counsel acknowledged to the military judge that he knew the morning of trial that Carol would invoke her Fifth Amendment privilege in response to any question about appellant's urinalysis and how it may have come up positive. Given this knowledge, counsel's asking any questions of that nature on direct examination in front of the members was not appropriate.

> [A] defendant does not have the right to call a witness to the stand simply to force invocation of the right against self-incrimination in the presence of the jury. *United States v. Lyons,* 703 F.2d 815, 818 (5th Cir.1983). "Neither side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him." *United States v. Johnson,* 488 F.2d 1206, 1211 (1st Cir.1973).

*United States v. Doddington,* 822 F.2d 818, 822 (8th Cir.1987). *See* Commentary to Standard 4-7.6(c), 1 ABA Standards for Criminal Justice,

The Defense Function at 4.94 (2d ed. 1979) ("Although the situation arises more frequently for the prosecutor than it does for defense counsel, it is equally unprofessional for either to call a witness he or she knows will assert a claim of privilege in order to encourage the jury to draw inferences from the fact that the witness claims a privilege. If there is genuine doubt whether the witness will claim the privilege or whether the validity of the privilege will be recognized, the matter should be resolved out of the presence of the jury."). Additionally, knowing that Carol would invoke her privilege as to any question regarding the urinalysis, defense counsel ought to have foreseen that *any* defense examination of Carol would lead to government cross in that area, which, in turn, would result in invocation of the privilege. In that light, defense counsel should not have called Carol at all as a witness until he had litigated the issue outside the presence of the members that is now before this Court.

In the end, the military judge granted the Government's motion to strike Carol's full testimony on direct examination. He explained: "The court finds that she will continue to invoke her rights as to any questions dealing with whether or not she was the source of the marijuana, and that goes to the crux of the credibility at that point."

In response to this ruling, assistant defense counsel moved "that these proceedings be abated until such time as this witness can be given a grant of immunity to testify." Trial counsel answered that, since Carol was a civilian and since any crime she may have committed was committed in the civilian community, the convening authority had no power to grant her immunity. After a half-hour recess, the military judge reconvened the session and explained, "I've been informed that telephonically trial counsel's been in contact with the SJA [staff judge advocate], who's coordinated with the local district attorney, and they are at this point unwilling to grant immunity."

Then the military judge asked the defense whether they had any other matters to litigate at that time. Assistant defense counsel replied that, through 2Lt Ayers, they intended to offer some statements Carol had made to other persons after her fight with appellant. The military judge told her to bring Ayers to the stand "and see if he can lay a basis for her testimony."

Ayers testified that Carol telephoned him from a convenience store after leaving appellant's house. "She sounded upset" and said, " 'I told him what I had done and he got upset ·and chased me out of the house.' " He drove to the store, met her, and followed her to appellant's house. She waited outside in the car while he and Torberg went into the house; Hartley joined them shortly thereafter.

The witness continued: "We sat down, and he had told us that she had told him earlier that she had put in the marijuana into his food and I guess they had gotten into a fight over that and he chased her out of the house." After some time, Carol opened the door to the house to let the dog inside; she complained to appellant about his leaving "the dog out in the rain." Appellant "told her to shut up and get out.... [H]e walked to the door ... to shut [it] behind her," and as she "walked down the sidewalk," she "turned around and said, 'You're luck[y] it wasn't DeCon.' "

At the end of Ayers' testimony, assistant defense counsel offered Carol's two statements—the one to Ayers and the other to appellant in Ayers' hearing—as "excited utterance[s]." Although the prosecution objected, the military judge ruled that Ayers could "testify about both statements" that he had heard Carol make. When the military judge asked what were the "defense's desires about abatement at this point," counsel answered:

DC: Sir, we're prepared to go forward with the case.

MJ: You're waiving the issue concerning the wife?

DC: Yes, sir.

MJ: The Article 39(a) session is in recess; let's summon the members.

ADC: Wait a minute; I'd like a clarification of what issue exactly are we waiving? I mean, we're waiving the request to have her immunized. Are you saying are we waiving the striking of her testimony?

MJ: No. The question as to the immunity at this stage.

ADC: We're not requesting that the witness be immunized. We're withdrawing that.

Trial did, indeed, go forward, and three additional defense witnesses testified—Ayers, Hartley, and Torberg. Ayers testified essentially as he had indicated he would in the Article 39(a) session discussed earlier, except that the military judge would not permit him to repeat what appellant had said to him about Carol's admitting her creative cuisine. Torberg and Hartley, similar to Ayers, testified that they heard Carol say to appellant, "You're lucky it wasn't DeCon."

## II

Mil.R.Evid. 301(f)(2), Manual for Courts–Martial, United States, 1984, provides:

> If a witness asserts the privilege against self-incrimination on cross-examination, the military judge, upon motion, may strike the direct testimony of the witness in whole or in part, unless the matters to which the witness refuses to testify are purely collateral.

In the factual context of this case, several observations must be made at the outset about this rule.

■ First, the basis of the rule is not limited to an accused's Sixth Amendment right to confront adverse witnesses. *Cf. United States v. Rivas*, 3 MJ 282, 285 (CMA 1977). Rather, it also is concerned with ensuring the "integrity of the judicial system and" the public's "confidence" in it by requiring "full disclosure of" the evidence via a proper functioning of the adversary system. *United States v. Richardson*, 15 MJ 41, 45 (CMA 1983), quoting from *United States v. Nobles*, 422 U.S. 225, 231, 95 S.Ct. 2160, 2166, 45 L.Ed.2d 141 (1975), in turn quoting from *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). As such, the rule applies to instances in which either an accused *or* the prosecution is deprived of cross-examination on a non-collateral subject; striking the direct testimony of a defense witness, when appropriate under the rule, does not, therefore, deprive the accused of constitutional due process. 15 MJ at 45–46.

■ Second, there are instances in which, notwithstanding the rule, an "accused's due-process and fair-trial rights require[ ] the military judge to fashion an appropriate remedy" to assist an accused's efforts to obtain critical defense testimony. *United States v. Zayas*, 24 MJ 132, 136 (CMA 1987). Here, when the military judge granted the Government's motion to strike Carol's testimony, assistant defense counsel moved to abate the proceedings until testimonial immunity for her could be sought. After obtaining a favorable ruling on admissibility of the testimony of Ayers,

Hartley, and Torberg, however, she waived any issue as to abatement.

■ Third, although the rule addresses a witness' claim made on cross-examination and while Carol claimed her privilege on direct examination, defense counsel's suggestion at trial that the rule does not apply for that reason is not persuasive. The Government would have asked the same questions on cross that drew Carol's invocation of privilege on direct; and she left no doubt, when forthrightly questioned about it during the out-of-court session, that she would answer no questions at all regarding appellant's urinalysis or how marijuana may have gotten into his system—questions that the Government surely indicated that they intended to ask. Under these circumstances, it would have been a meaningless formality to send the witness and the parties back into the open courtroom and require Carol to decline to answer these questions on cross-examination by the prosecutor before the military judge could entertain the motion to strike. *See United States v. Hill*, 18 MJ 459, 461–62 (CMA 1984).

■ Fourth, the rule only empowers—it does not require—a military judge to strike testimony under circumstances addressed by the rule. Further, any such remedial striking may be of either the entire testimony on direct or some part of it. In other words, the rule anticipates that a military judge to whom such a motion to strike is made will approach a ruling with some sensitivity to determining what if any remedy is necessary to achieve fairness and justice through the adversary system. *See United States v. Lucas*, 25 MJ 9, 11 (CMA 1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 764 (1988). It is this point to which appellant principally addresses himself in this Court and to which we will return momentarily.

■ Finally, striking earlier testimony is not permitted under the rule if the refusal to answer questions relates only to matters that "are purely collateral." The drafters of the rule in their analysis equate "collat-

eral" with "evidence of minimal importance (usually dealing with a rather distant fact solicited for impeachment purposes)...." Drafters' Analysis, Manual, *supra* at A22–6 (Change 2). *See United States v. Richardson*, 15 MJ at 47. The drafters caution, however, that "[w]here the privilege reaches the core of the direct testimony or prevents a full inquiry into the credibility of the witness, ... striking of the direct testimony would appear mandated." Manual, *supra* at A22–6 (Change 2). As was clear from our earlier recitation of the trial litigation, this aspect of the rule, too, was in some dispute between the parties.

■ These points established, let us focus now on what was in issue in this trial. Carol testified at some length about her apparently strong emotional attitude toward the Army and toward appellant and his relationship with the Army. When defense questioning went beyond these subjects to address, in effect, whether Carol's state of emotion had led her to cook marijuana in appellant's food, she declined to answer.

If trial counsel's purpose in wanting to cross-examine Carol along these latter lines was simply to test the strength and degree of her emotional dislike of the Army and her resentment of her husband, then it might well have been within the military judge's discretion under Mil.R.Evid. 301(f)(2) to grant the motion to strike: Basically put, a witness does not get to offer testimony about her hatred of the Army and her husband without the opposing party having a fair opportunity through cross-examination to test the commitment to that emotion and to probe in what ways the witness might act or react because of that emotion.

It is not clear, however, that that was the purpose of trial counsel's intended cross-examination. For instance, he seemed to suggest that he believed the answer to whether she had cooked marijuana in appellant's food would undermine her credibility as a witness in some *general* way, as a lawbreaker. That surely would be collateral. He also seemed to suggest that, if he

got a "yes" answer to that question, he would want to probe her testimony in some depth as to the details of her actions in order to rebut them with expert testimony. However, it would not seem that trial counsel had to worry about that unless she *did* answer "yes"—which, of course, she indicated she had no intention of doing.

Perhaps a useful way of illustrating this view of the litigation here is in light of a sentence in the Drafters' Analysis of Mil. R.Evid. 301(f)(2), quoted earlier:

> Where the privilege *reaches the core of the direct testimony* or *prevents a full inquiry into the credibility of the witness,* however, striking of the direct testimony would appear mandated.

(Emphasis added.) Carol's exercise of her privilege here did not reach the "core of [her] direct testimony," for the core of that testimony was her hatred of the Army and her resentment of her husband, not that she had cooked marijuana in appellant's food. Neither did questioning her about her cooking prevent a full inquiry into her credibility—*unless,* as we mentioned earlier, trial counsel actually intended to represent that he was seeking to test the strength and power of her emotions.

Surely, given appellant's defense, questioning of Carol about how marijuana may have gotten into appellant's system before the urinalysis was not "collateral to the main issues at trial." *See* S. Saltzburg, L. Schinasi, & D. Schlueter, *Military Rules of Evidence Manual* 111 (3d ed.1991). Indeed, that question was the main issue in this trial. Accordingly, when Carol indicated that she intended not to answer any questions on this subject and when the prosecution indicated that it fully intended to propound such questions, the military judge was within his discretion under Mil. R.Evid. 301(f)(2) to strike any direct testimony on that topic.

The vast majority of Carol's testimony, however, did not directly relate to this subject. Thus, the question is whether the military judge abused his discretion when he struck *all* of her testimony—most of which was limited to her emotions about

the Army and her husband—as opposed to cutting more precisely to exclude only that part of direct examination regarding her cooking habits.

Regardless, even if the military judge did err, we are persuaded beyond a reasonable doubt that any error was harmless. Carol's dislike of the Army and her emotional resentment of appellant for repeatedly choosing the Army over their marriage were well-established apart from her testimony and were not specifically challenged. Since that is the only part of her testimony that appellant wished to retain, losing it did not materially impact on his ability to present his defense.

### III

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judge GIERKE concur.

COX, Judge, joined by CRAWFORD, Judge (concurring):

When defense counsel asked the former Mrs. Moore, "Did you put that marijuana in his food?," I take it that his purpose was to suggest that she did—especially since counsel apparently had reason to anticipate that she would thereupon claim a Fifth Amendment right against self-incrimination. Moreover, I take it that no one disputes that this suggestion of treachery was the entire purpose of the motive-oriented line of questioning leading up to the "hot" question. Thus I can make no rational argument in my own mind that the preliminaries were somehow collateral to the main event. In this circumstance, I cannot conclude that the military judge abused his discretion in striking the witness' testimony.*

If having the witness' answer was that important to the defense, the correct solution was to persist for abatement until testimonial immunity was obtained. I gather, however, that after all was said and done, including admission of hearsay testimony of the wife's statements, the result was at least as useful as having the answer (and possibly sparing the witness a perjury charge, thereby), so I cannot fault the defense for withdrawing the request for abatement.

---

* *See also* n.4. of the majority opinion. The witness should never have been asked the question.